John M. SPAETH, Respondent,

v.

The CITY OF PLYMOUTH, Appellant.

Nos. CO–82–1332, C4–83–761.

Supreme Court of Minnesota.

Feb. 10, 1984.

LeFevere, Lefler, Kennedy, O'Brien & Drawz, John G. Kressel, Herbert P. Lefler, III, Lorraine S. Clugg, Minneapolis, for appellant.

Stacker, Ravich & Simon, Eileen M. Roberts, Olson Gunn & Seran, Ltd., Harold H. Sheff, Minneapolis, for respondent.

SCOTT, Justice.

Plaintiff John M. Spaeth brought this action against the City of Plymouth ("City") alleging that it has taken without compensation a portion of his property for use as a storm water holding pond in violation of U.S. Const., amend. V, and Minn. Const., art. 1, § 13. After a trial without a jury, the district court granted Spaeth's petition for a writ of mandamus and ordered the City to commence eminent domain proceedings. It also ruled that Spaeth was entitled to attorneys' and experts' fees pursuant to Minn.Stat. § 117.-045 and ordered Spaeth to submit his petition for reimbursement of those expenses within 40 days. Before the trial court determined the amount of the fees, the city appealed (C0–82–1332), claiming there has been no taking and, even if there has been a taking, Spaeth is not entitled to expenses pursuant to section 117.045 in the circumstances presented. The trial court subsequently awarded Spaeth attorneys' and experts' fees in the amount of $66,158.12. The city then appealed from entry of that judgment (C4–83–761), challenging both the trial court's continuing jurisdiction to determine the amount of the fees and the amount of the fees awarded. On July 12, 1983, this court ordered consolidation of C0–82–1332 and C4–83–761. We now affirm both judgments.

Since the mid-1960's, the City of Plymouth has been developing rapidly. In 1973 the City adopted a Storm Drainage Plan "to provide an adequate and economical means of conveying storm water runoff through the [City]." In creating such a plan, a municipality has several design options ranging from the more expensive underground storm sewer system to a less expensive system of holding ponds and drainage easements. In furtherance of its storm water management goals, the City planned to utilize a combination of underground and surface systems to provide the most efficient and economical system. Ponds, swamps and lowlands throughout the City were thus designated as "ponding areas."

In November of 1974, plaintiff John Spaeth purchased approximately 41 acres of undeveloped land in the City of Plymouth, intending to develop it in the future. A portion of that property is lowland area. According to the 1973 plan, the low areas of Spaeth's land and other adjoining lands were designated as ponding area "GL–P2". Spaeth, who was a member of the Plymouth City Council when the 1973 plan was adopted, knew that a portion of his property had been designated as a ponding area, but he expected to be compensated in light

of certain provisions of the 1973 plan. That plan "assumed" that the City "would have to purchase ponding areas and obtain flooding easements for the area surrounding the ponds." The plan generally estimated the cost for ponds and easements at $2,000 per acre. The projected cost of GL–P2 was $176,000, including costs in addition to land acquisition. Plaintiff, however, did not contemplate monetary compensation when he purchased the property; rather, he contemplated authorization to develop the upper area of his land at higher densities than allowed under the City's guiding plan.

When Spaeth purchased the property, surface water drained through the low area in the southeast corner of his property, then through a ditch ("old ditch") located on a marsh area of property to the south and eventually to Gleason Lake. The old ditch essentially followed a natural watercourse, but it was deeper than the natural depression. Timothy Skoglund, a registered engineer, opined that, when Spaeth purchased the property in 1974, the drainage of Spaeth's low land was controlled by the outlet elevation of the old ditch which was at 989 feet. In contrast, the lowest point on Spaeth's land is at elevation 990.4 feet.

The instant controversy was sparked in 1978 when the developer of land to the south of Spaeth's eliminated the old ditch and created a new ditch with different drainage characteristics. Witnesses familiar with Spaeth's property testified about water conditions existing there before the elimination of the old ditch. According to them, surface water accumulated on the low area in the spring due to melting snow and rain, but that ditch drained the water by June and the lowland area existed as a dry meadow thereafter. One witness did testify that water would also accumulate whenever there was a heavy rain of 6 to 8 inches and that it would take approximately one week to "dry out pretty good."

Sometime prior to 1978, Northland Mortgage Company ("Northland") acquired the land south of Spaeth's on which the old ditch was located. Northland subsequently platted that property for residential development as the Maple Creek addition ("Maple Creek"). With respect to the grading of that site, Peter Molinaro, a project engineer, testified that "the City's Storm Sewer Plan [required Northland] to provide a pond [GL–P2] to the north." To design the grading plan, project engineers for Northland met with the City and its consultant to get "the elevations and the flows from that pond." Northland eventually submitted a grading plan to the City which it referred to its consulting engineers "to review the plan for conformance with the storm drainage plan." The 1973 Storm Drainage Plan required the control elevations of GL–P2 to be at elevation 995 feet and a 100-year flood elevation at 998.[1]

Northland began developing the site in 1978. In the latter part of 1978, it filled in the old ditch and built a new ditch according to the grading plan. Northland installed an earth berm in the new ditch. The top of the berm was at an elevation of approximately 998 feet. It then intended to install an overflow structure north of that berm to control the water elevation of the ponding area at 995 feet. According to the plan, water overflowing that control structure would drain through a pipe at the bottom of the berm at a controlled rate. That control structure was never installed.

Before Northland could install the control structure, Spaeth complained to the City that his property was being flooded. On April 11, 1979, the City investigated the matter and found the water level to be at elevation 994.45 feet. Fred Moore, Director of Public Works, decided to lower the berm to the contour of the ditch immediately downstream of the berm. In April

1. The term "control elevation," also known as the "normal water level," does not mean that the water would always be at that level in the low area. Rather, it means that the water would flow out of the low area once it went over that level. The "hundred year water level" means "the water level that is expected to be reached on the average of once every one hundred years."

or May of 1979, City work crews lowered the berm to an elevation of approximately 993 feet. In conjunction with that action, the contour of the ditch upstream of the berm was lowered to the level of the marshy area to the north. The City's actions somewhat lowered the water level on Spaeth's land.

Since that time, the outlet elevation of the new ditch has been controlled at approximately 993 feet. Skoglund gave his opinion that the new ditch thus raised normal water levels "from the essentially water-free condition somewhere below elevation 991 to a normal water level now of elevation 993." The evidence at trial tended to show that standing water has occupied the center and southeast area of Spaeth's lowland since that time as a result. Kent Lokkesmoe, a regional hydrologist employed by the Department of Natural Resources, testified that he estimated the ordinary high water level of GL–P2 to be at elevation 993.7 feet as of April 7, 1982.[2] Spaeth's lowland area has also undergone physical changes, marked by the dying off of trees and the increasing presence of aquatic vegetation such as cattails. The land also presently provides a habitat for species of animals associated with freshwater marshes, including ducks, geese and muskrat. According to Spaeth, those species were not present before 1978.

After leaving his position as a city council member in 1979, Spaeth began to work on plans to develop his property. The development was to be known as Lillie Pond. When Spaeth submitted a development proposal to the City in early 1980, it discovered that the contour maps upon which it relied to design GL–P2 were erroneous. Those maps showed the elevations on Spaeth's property to be approximately two to four feet higher than the actual elevations of that property. For example, the erroneous maps showed the lowest point on Spaeth's

land to be at elevation 994 feet, while it was actually 990.4 feet. Prior to adopting any changes, the City was advised by its consulting engineer in a letter dated September 24, 1980, that the outlet elevation of the marsh was "somewhat below elevation 991" before the creation of the Maple Creek Development. In that same letter, the City was further advised of the following alternatives with respect to revising the specifications for GL–P2:

> A normal water level (for storage purposes) of 991 would require some downstream revisions in the outlet channel through the Maple Creek plat to the south. This channel was changed as a part of that Development in accordance with the then existing ponding criteria for GL–P2. A normal water level of 992.5 would not require any downstream revision and would represent the now existing water level in the marsh * * *. The 9925 [sic] elevation also results in up to 1½ feet of water in the marsh which would be more beneficial for wildlife habitat.

In November of 1980, the City adopted its second Storm Drainage Plan. The low area on Spaeth's property was again designated as part of GL–P2. This time the City adopted a control elevation of 992.5 and a 100-year flood level of 995.5 for GL–P2. The City also increased the storage area of GL–P2 from 55 acre feet to 69 acre feet and reduced the pond outflow from 10 cubic feet per second (CFS) to 5 CFS.[3] Those latter changes were intended to increase the storage to compensate for increased discharge by Maple Creek. Unlike the 1973 plan, the 1980 plan did not provide cost estimates for certain ponding areas such as GL–P2 because the City assumed that those ponding areas "would be set aside for public use at no expense to the [City]," "[b]ased on DNR regulations which

---

**2.** Minn.Stat. § 105.37, subd. 16 (1982), defines " '[o]rdinary high water level' " as "the boundary of public waters and wetlands, and shall be an elevation delineating the highest water level which has been maintained for a sufficient period of time to leave evidence upon the landscape,

commonly that point where the natural vegetation changes from predominantly aquatic to predominantly terrestrial."

**3.** Spaeth's lowland would be required to provide 50% of the storage for GL–P2 (34 acre feet).

prohibit development in wetlands and marshes."

During 1980, Spaeth submitted several development plans which were rejected by the City. He presently has no plans before the City. According to Spaeth, he filed this action because the City would not give him either density credit or monetary compensation in exchange for the holding pond it allegedly created on his property.

The following issues are presented to this court:

(1) Under these facts, has the City taken the plaintiff's real property in violation of U.S. Const., amend. V, and Minn. Const., art. 1, § 13?

(2) If so, is the plaintiff property holder entitled to an award of attorneys' and experts' fees pursuant to Minn.Stat. § 117.-045 (1982)?

(3) In such a case, are pre-litigation expenses incurred by plaintiff recoverable?

(4) Did the trial court have continuing jurisdiction to issue an order awarding such fees after an appeal was perfected by the City?

■ 1. Finding that the City has permanently flooded a large portion of Spaeth's property, the trial court ruled that it had taken private property for public use without just compensation in violation of U.S. Const., amend. V, and Minn. Const., art. 1, § 13, by "designating and creating GL–P2 on [Spaeth's] property." The City initially argues that it did not take Spaeth's property by adopting and later revising its storm drainage plan. Although the storm drainage plan proposes the appropriation of

a portion of Spaeth's land for public use, the City contends it cannot be held liable for mere planning. Generally, a landowner has no action against a government body for mere plotting or planning, without more, in anticipation of taking land. *See City of Buffalo v. Clement Co.*, 28 N.Y.2d 241, 255–58, 321 N.Y.S.2d 345, 357–59, 269 N.E.2d 895, 903–05 (1971); Annot., *Plotting or Planning in Anticipation of Improvement as Taking or Damaging of Property Affected*, 37 A.L.R.2d 127 (1971).[4] We need not address whether the adoption of the storm drainage plan constitutes a taking here, because the instant record shows that the City clearly went beyond the mere planning stage by implementing its storm drainage plan with respect to Spaeth's property.

■ The trial court was not clearly erroneous in finding that (1) even though surface waters generally accumulated on Spaeth's lowland in the spring due to melting snow and rain before the old ditch was eliminated in the fall of 1978, that ditch drained the water by early June and left the lowland as a dry meadow thereafter, and (2) standing water has continually occupied a large portion of Spaeth's property since Northland eliminated the old ditch and created the new ditch which raised the outlet elevation of the area in question. The City, however, adamantly disavows responsibility for the standing water on Spaeth's property. The City contends that the increased accumulation of water has been caused either by increased development in the area or by heavy rain, rather

**4.** Courts have not been reluctant to find a taking where zoning ordinances provided only for public use of the property. *See Bartlett v. Zoning Commission of the Town of Old Lyme*, 161 Conn. 24, 30–31, 282 A.2d 907, 910–11 (1971) (zoning regulations restricted the use of owner's tidal marshland to wooden walkways, wharves, duck blinds, public boat landings and public ditches in absence of special exception for other limited uses); *Hager v. Louisville Zoning Commission*, 261 S.W.2d 619, 620 (Ky.Ct.App.1953) (city zoned private property as a ponding area for water storage in accordance with a flood control plan); *Morris County Land Improvement Co. v. Township of Parsippany-Troy Hills*, 40 N.J. 539, 555, 193 A.2d 232, 241 (1963) (zoning regulation had purpose and practical effect of appropriating private property for water detention basin or open space); *City of Plainfield v. Borough of Middlesex*, 69 N.J.Super. 136, 144–45, 173 A.2d 785, 789–90 (1961) (property zoned for use as a school, park and playground); *Rippley v. City of Lincoln*, 330 N.W.2d 505, 507 (N.D.1983) (property zoned solely for public use). Two themes dominate those cases: (1) the regulation left landowners with no reasonable use of the property, and (2) the regulation treated the property as a public facility for the benefit of the local government and its people under the guise of regulation.

than the raising of the outlet elevation. We reject that contention because it is too speculative on this record. In light of that, the following factors show that the City cannot escape responsibility for the raising of the outlet elevation of the area in question: (1) a portion of Spaeth's property was designated as a ponding area in the 1973 Storm Drainage Plan; (2) in 1978, Northland was required to grade its site in accordance with that plan; (3) Spaeth's land was subsequently flooded; (4) after Spaeth complained to the City about the flooding, city work crews lowered the earth berm in the new ditch to approximately elevation 993 feet in the spring of 1979, releasing much of the water but not all of it; (5) in 1980, the City found out that it had relied upon erroneous information concerning the contours of Spaeth's land in designing the specifications for GL–P2; (6) the City's engineers subsequently inspected the site and made recommendations with respect to revised specifications for GL–P2; (7) their recommendations alerted the City to the fact that the control elevation of the new ditch (thought to be at 992.5) was higher than the prior outlet elevation of that area; (8) yet, the City adopted a control elevation of 992.5 in the 1980 plan; and (9) there has been no alteration in the drainage characteristics of Spaeth's property since the spring of 1979, even though the outlet elevation of the new ditch is actually higher (993) than required by the 1980 plan. It turns out that the outlet elevation of the new ditch, as it now exists, is two to four feet higher than the outlet elevation of the old ditch. On this record, we conclude that the City has physically appropriated a portion of Spaeth's property for a public purpose as planned.

■ Nevertheless, the City contended at oral argument that there has been no taking under the enterprise/arbitration test recently adopted by this court in *McShane v. City of Faribault*, 292 N.W.2d 253, 258 (Minn.1980), because it was acting in an arbitration capacity. The City erroneously assumes that the enterprise/arbitration test applies here. That test applies only where government has allegedly taken property by regulating property use and not where, as here, government has physically appropriated property. One commentator has stated:

> [W]here there is a physical appropriation of property there is unquestionably a "taking" even where it is sought to avoid payment upon the ground that the appropriation was made in the exercise of the sovereign's police power. It is universally conceded that when land or other property is actually taken from the owner and put to use by the public authorities, the constitutional obligation to make just compensation arises, however much the use to which the property is put may enhance the public health, morals or safety.

2 J. Sackman, *Nichols' Law of Eminent Domain* § 6.05 (rev. 3d ed. 1983).

■ The City alternatively argues that there has been no taking under the "physical government activity" standard set forth in *McShane*. There, we stated that "a compensable taking has occurred," when physical government activity "causes a definite and measurable decrease in the value of plaintiffs' property and interferes with the current practical enjoyment of the property." 292 N.W.2d at 257. That standard need not be applied to determine whether a compensable taking has occurred where, as here, government physically appropriates property as planned or where government activity results in a permanent physical occupation. Where government action results in a permanent physical appropriation or occupation of property, there certainly has been a taking. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 3175–76, 73 L.Ed.2d 868 (1982); *Pumpelly v. Green Bay Co.*, 80 U.S. 166, 177–79, 20 L.Ed. 557 (1871); *Nelson v. Wilson*, 239 Minn. 164, 169, 58 N.W.2d 330, 333 (1953); *Weaver v. Mississippi & Rum River Boom Co.*, 28 Minn. 534, 539–41, 11 N.W. 114, 115–16 (1881); *Arneson v. City of Fargo*, 331 N.W.2d 30, 38 (N.D.1983); *see also* 2 J. Sackman, *supra*, at § 6.08. Thus, we need not decide whether Spaeth has proved a taking under the standard set forth in *McShane*.

 Finally, the City contends that the trial court erred by finding that it has permanently flooded Spaeth's property and, therefore, there has been no taking. In *Nelson,* 239 Minn. at 172, 58 N.W.2d at 335, this court stated, "Whether occasional flooding is of such frequency, regularity, and permanency to constitute a *taking* and not merely a temporary invasion for which the landowner should be left only to a possible recovery of damages is a question of degree * * *." (Emphasis in original.) Permanent in this context refers to "a servitude of indefinite duration," even if intermittent. *Wilfong v. United States,* 480 F.2d 1326, 1329 (Ct.Cl.1973); *see also Tri-State Materials Corp. v. United States,* 550 F.2d 1, 4 (Ct.Cl.1977). In the instant case, the evidence shows more than occasional water accumulation; rather, a portion of Spaeth's property has generally remained flooded for approximately three years. It also appears that the situation will continue. Fred Moore, Director of Public Works, testified that the City would be willing to alter the control elevation of GL–P2 to lower the water level, but Spaeth would still be required to provide 34 acre feet of storage for GL–P2. Thus, the evidence establishes that the City is reluctant to entirely abandon Spaeth's property as a ponding area. Furthermore, the evidence shows that the Minnesota Department of Natural Resources ("DNR") has established jurisdiction over the "wetland" existing on Spaeth's property and, therefore, the City cannot unilaterally alter the control elevations for GL–P2. It must acquire permission from the DNR to do so. There is no indication in the record as to the DNR's position on this matter. On this record, it is not clear whether the City will or can abate the flooding. Accordingly, we uphold the trial court's ruling that there has been a taking and its issuing a writ of mandamus compelling the City to commence eminent domain proceedings.[5]

2. Defendant challenges the trial court's holding that Spaeth is entitled to attorneys' and experts' fees pursuant to Minn.Stat. § 117.045 (1982). Section 117.-045 provides in relevant part:

If a person successfully brings an action compelling an acquiring authority to initiate eminent domain proceedings relating to his real property *which was omitted from any current or completed eminent domain proceeding,* such person shall be entitled to petition the court for reimbursement for his reasonable costs and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred in bringing such action. Such *costs and expenses shall be allowed only in accordance with the applicable provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970* [hereafter "Relocation Act"] [42 U.S.C. § 4601 et seq.] * * *.

(Emphasis added.) Defendant argues on appeal, as it did below, that there was no evidence that Spaeth's property was omitted from any current or completed eminent domain proceeding and, therefore, Spaeth is not entitled to those fees pursuant to that statute. The trial court rejected that argument, ruling that Spaeth was entitled to attorneys' and experts' fees pursuant to section 117.045 because defendant "appropriated property of [Spaeth]" and "omitted this land from the acquisition program necessitated by its storm drainage plans."

 A literal reading of the statute tends to support defendant's position. However, we must construe the statutory language to avoid reaching an absurd or unreasonable result. *Milbank Mutual Insurance Co. v. Kluver,* 302 Minn. 310, 313, 225 N.W.2d 230, 232 (1974); *Schoening v. United States Aviation Underwriters, Inc.,* 265 Minn. 119, 127, 120 N.W.2d 859, 864 (1963); *Merritt v. Stuve,* 215 Minn. 44, 50, 9 N.W.2d 329, 332 (1943). To adopt

---

**5.** Because we hold that there has been a taking, we need not address the City's argument that its actions should be judged by the "reasonable use" doctrine and that it reasonably diverted surface water onto Spaeth's property. *See Ste-*

*vens v. State,* 291 Minn. 263, 265, 190 N.W.2d 482, 484 (1971); *In re Town Ditch No. 1 v. Blue Earth County,* 208 Minn. 566, 571–72, 295 N.W. 47, 49 (1940).

defendant's construction would mean that a landowner could recover costs and expenses when an acquiring authority fails to acquire enough property, but not when it fails to make any provision whatsoever for eminent domain proceedings. We agree with plaintiff that such a result is ludicrous. Contrary to defendant's narrow reading of section 117.045, we believe the purpose of that section is to assure that any landowner who is forced to take legal action against an acquiring authority is made whole. In support of that conclusion, we note that section 117.045 incorporates the provisions of the federal Relocation Act. That act authorizes recovery of litigation expenses in successful inverse condemnation actions brought against the United States. *See* 42 U.S.C. § 4654(c) (1983). Thus, we conclude that the trial court correctly construed section 117.045 to apply whenever a landowner successfully brings an action to compel eminent domain proceedings with respect to land which was omitted from a proceeding which should have been commenced. Accordingly, Spaeth is entitled to attorneys' and experts' fees pursuant to section 117.045.

3. Defendant next challenges the amount of the attorneys' and experts' fees awarded to Spaeth. The trial court found that Spaeth incurred attorneys', surveyors' and appraisers' fees totaling $82,697.64. Although some of those fees were also incurred with respect to the proposed Lillie Pond Development, it concluded that such work was also necessary for prosecution of this action. To account for the dual purpose underlying some of the fees, the court arbitrarily reduced the total by 20%, awarding Spaeth $66,158.12 for attorneys' and experts' fees pursuant to Minn.Stat. § 117.045.

On appeal defendant does not challenge the attorneys' and appraisers' fees, totaling

$50,751.50. However, it does challenge the following fees on the ground that they were incurred prior to litigation:

| | |
|---|---|
| DeMars Gabriel Land Surveyors, Inc. | $14,885.40 |
| Westwood Planning & Engineering Co. | 9,198.63 |
| James P. DeBenedet, Engineering Consultant | 1,726.86 |

It argues that pre-litigation expenses cannot be recovered pursuant to section 117.045 and, therefore, the trial court erroneously included those claimed fees in the award to Spaeth.

This court has not previously addressed the issue of whether section 117.045 precludes awarding fees incurred prior to bringing an action.[6] In support of its position, defendant cites *Emeny v. United States*, 526 F.2d 1121, 1124 (Ct.Cl.1975), a case involving the Relocation Act. In that case, three years passed from the time of the alleged government invasion until plaintiffs filed suit in court. During that time, the plaintiffs spent a considerable amount of money attempting to ascertain the extent of their property right and to obtain, through negotiations with the government, a recognition of their right. The United States Court of Claims ruled that those expenses were not incurred "because of" the proceeding, holding that "the plain language of 42 U.S.C. § 4654(c) precludes the court from including in its award to the plaintiffs any reimbursement for expenses incurred * * * before they decided to file suit in the Court of Claims." *Emeny*, 526 F.2d at 1124.

Defendant urges us to follow that case. We decline to do so. Although such a bright line test is appealing, we do not agree that the terms of the statute necessarily preclude recovery of pre-litigation expenses such as those related to ascertaining the extent of one's property right or those related to attempts at amicably set-

---

6. Section 117.045 provides "reimbursement for * * * reasonable costs and expenses, including reasonable attorney, appraisal and engineering fees, *actually incurred in bringing such action.* * * * expenses shall be allowed only in accordance with the applicable provisions of the [Relocation Act] * * *." (Emphasis added.) With respect to successful inverse condemnation ac-

tions brought against the United States, the Relocation Act provides reimbursement "for * * * reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, *actually incurred because of the proceeding.*" 42 U.S.C. 4654(c) (1983) (emphasis added.)

tling a dispute. We hold that the critical inquiry in determining whether pre-litigation expenses are recoverable under section 117.045 is whether such expenses were necessary for prosecuting the action. Of course, that must be determined in the circumstances of each case.

■ In the instant case, we conclude that the trial court did not err in including the disputed fees in its computation of the fee award. Generally speaking, we agree with plaintiff that the fees incurred with respect to the proposed Lillie Pond Development were also necessary to prosecute this action because (1) Spaeth determined that he would have to take the matter to court to gain appropriate relief; (2) many exhibits at trial arose from that work; and (3) much of the information developed was relied on heavily by his key expert witness in preparation for and at the trial. Significantly, the trial court did not award the disputed fees to Spaeth in full. Rather, it reduced the total fees by 20% to account for the dual nature of some of the fees.[7] Having conducted the trial and the hearing on the fees issue, the trial court is in the best position to determine the extent to which those fees were necessary to the prosecution of the action. We therefore hold that the trial court did not abuse its discretion on this record in calculating the fee award in the manner that it did.

4. Finally, defendant challenges the trial court's continuing jurisdiction to issue the order setting the amount of Spaeth's fees in the circumstances of this case. Pursuant to a judgment entered on September 1, 1982, the trial court granted Spaeth's petition for a writ of mandamus to compel defendant to initiate eminent domain proceedings and ordered the city to do so within 30 days. Having also concluded that Spaeth was entitled to costs and expenses, including reasonable attorneys' and experts' fees pursuant to Minn.Stat. § 117.-045, it further ordered Spaeth to file a petition for costs and expenses within 40 days. On September 29, 1982, defendant filed a notice of appeal from the judgment entered on September 1, 1982, and the writ of mandamus issued on September 21, 1982.[8] After filing that appeal, it contested the district court's jurisdiction to then set the amount of Spaeth's costs and expenses. In an order dated November 3, 1982, the district court ruled that it had continuing jurisdiction to do so on the grounds that: (1) the matter was independent and collateral to the judgment appealed from, and (2) a decision would enable all aspects of the case to come before this court at once. It subsequently issued the order awarding Spaeth $66,158.12 for fees and expenses pursuant to Minn.Stat. § 117.045.

On appeal, defendant claims that the district court had no jurisdiction to enter that order and, therefore, it is void. It contends that we must vacate that order and remand for the district court to redetermine the amount of Spaeth's fees. Minn.R.Civ. App.P. 108.03 provides that the perfection of an appeal "shall stay all further proceedings in the trial court upon the judgment or order appealed from or the matter embraced therein; *but the trial court may proceed upon any other matter included in the action, and not affected by the judgment or order appealed from.*" In the past, this court has stated: "Pending a duly executed appeal, the jurisdiction of a trial court is *suspended* only to those matters necessarily involved in the appeal, not as to those matters which are independent of, or which are supplemental to, the appeal or collateral to the proceeding in which the appealed order or judgment was rendered." (Emphasis in original.) *State v. Barnes*, 249 Minn. 301, 302–03, 81 N.W.2d 864, 866 (1957); *see also State ex rel. Peterson v. Bentley*, 216 Minn. 146, 161, 12 N.W.2d 347, 355 (1943); 1 B Dunnell Minn. Digest 2d, *Appeal and Error* § 13.12 (3d ed. 1982).

The parties thus take issue as to whether the order setting the amount of Spaeth's

---

7. Although the trial court reduced the total fees by 20%, that in effect reduced the disputed fees by a much higher percentage because the city did not contest the amount of the attorneys' and appraisers' fees, totaling approximately $50,000.

8. The writ of mandamus ordered the City to initiate eminent domain proceedings by October 1, 1982.

fees and expenses is a matter collateral to or independent of the judgment appealed from. Spaeth, as did the trial court, cites federal case law for the proposition that a claim for attorneys' fees (hence experts' fees) should be treated as a matter collateral to or independent of the merits of the litigation. *See Terket v. Lund*, 623 F.2d 29, 32–34 (7th Cir.1980); *Brown v. Fairleigh Dickinson University*, 560 F.Supp. 391, 402–03 n. 4 (D.N.J.1983). *See also Obin v. District No. 9 of International Association of Machinists and Aerospace Workers*, 651 F.2d 574, 584–88 (8th Cir. 1981). *Contra Wright v. Jackson*, 522 F.2d 955, 958 (4th Cir.1975) (held trial court should either award fees before appeal is taken or wait until after appeal is decided). Claiming that this court should follow that rule here, Spaeth contends that the trial court correctly ruled that it had continuing jurisdiction to rule on the amount of Spaeth's fees and expenses because that matter was collateral to the merits of the litigation.

*Terket* addressed the question of whether a trial court retains jurisdiction to award attorneys' fees pursuant to 42 U.S.C. § 1988 after notice of appeal is filed on the substantive issue. The court first pointed out that the rule divesting a trial court of jurisdiction is designed to avoid the confusion and waste of time potentially arising from having the same issues before two courts at the same time. *Terket*, 623 F.2d at 33. Because a claim for attorneys' fees did not involve reconsideration of the merits, the court believed that that policy would not be defeated by having the trial court decide the attorneys' fees while an appeal is pending. *Id.* at 34. It also concluded that to do so would not undercut the policy against piecemeal appeals. Rather, it believed such a rule would be less likely to cause delay and waste effort because the attorneys' fees motion may be decided before the pending appeal has been argued and thus an appeal from the ruling on attorneys' fees could be consolidated with the pending appeal. *Id.* The court concluded, "Therefore, district courts in this circuit should proceed with attorneys' fees motions, even after an appeal is filed, as expeditiously as possible." *Id.*

■■■ We think that the reasoning of *Terket* is sound, especially as applied in the instant case. Here, all parts of the case are now before the court. If the trial court had not entered the order setting the amount of fees, this court would be required to remand for further proceedings since we have upheld the trial court on the merits and on its ruling that Spaeth was entitled to fees and expenses pursuant to Minn.Stat. § 117.045. Accordingly, we hold that a claim for attorneys' and experts' fees pursuant to section 117.045 should be treated as a matter independent of the merits of the litigation. To ensure that all aspects come before the appellate court for disposition in one proceeding, we strenuously urge the district courts either to rule on such claims as soon as possible after entry of judgment on the merits or to not enter judgment on the merits until the fees issue has been finally resolved.

The City, however, contends that the instant case comes squarely within the language of Rule 108.03 and, therefore, the cases cited by Spaeth do not apply. It first points out that the initial judgment from which it appealed determined that Spaeth was entitled to fees and expenses. Thus, once it perfected its appeal from that judgment, it contends that the district court had no jurisdiction to determine the amount of Spaeth's fees because that matter was related to the judgment appealed from and not a collateral matter.

■■■■ There is no merit to the City's contention. The order concerning the claim for attorneys' and experts' fees was not final and appealable until the trial court set the amount of Spaeth's award. Thus, even though the trial court had also ruled that Spaeth was entitled to costs and expenses pursuant to section 117.045 when it entered judgment on the merits on September 1, 1982, a nonappealable order is not rendered appealable by joining it with an appealable order. *Muggenburg v. Leighton*, 240 Minn. 21, 24, 60 N.W.2d 9, 11 (1953). Where a party appeals from a nonappealable order or judgment, the trial court re-

tains jurisdiction to proceed further in the case. *Velin v. Lauer Brothers*, 128 Minn. 10, 13, 150 N.W.2d 169, 170 (1914); *Fay v. Davidson*, 13 Minn. 523, 524 (Gil. 491, 492) (1858). Accordingly, we conclude that the trial court had continuing jurisdiction to enter the order awarding Spaeth attorneys' and experts' fees in the amount of $66,-158.12 under the circumstances of this case.

Having decided the case in this manner, we need not discuss the possible application of 42 U.S.C. §§ 1983, 1988 or other issues which are unnecessary to the disposition of the inverse condemnation action.

Affirmed.

PETERSON, J., took no part in the consideration or decision of this case.