Arlene LeZALLA, et al., Respondents,

v.

STATE of Minnesota, Commissioner of Public Welfare, et al., Appellants,

Harmony Nursing Home, Inc., et al., Respondents,

and

STATE of Minnesota and Leonard W. Levine, et al., Defendants and Third Party Plaintiffs, Appellants,

v.

HARMONY NURSING HOMES, INC., et al., Third Party Defendants, Respondents,

and

Martha GONSIOR, et al., Respondents,

v.

HARMONY NURSING HOME, INC. Respondent,

State of Minnesota, Commissioner of Public Welfare, et al., Appellants,

and

HARMONY NURSING HOMES, INC., et al., Respondents,

v.

The MINNESOTA DEPARTMENT OF PUBLIC WELFARE and Leonard W. Levine, etc., Appellants,

and

Alma THOLEN, et al., Respondents,

v.

NORTH ST. PAUL NURSING HOME, Respondent,

and

William BLICKENDERFER, et al., Respondents,

v.

HARMONY NURSING HOME, INC. Respondent,

State of Minnesota, Commissioner of Public Welfare, et al., Appellants.

No. C3-84-1832.

Court of Appeals of Minnesota.

April 23, 1985.

Hubert H. Humphrey, III, Atty. Gen., Gail M. Olson, John L. Kirwin, Sp. Asst. Attys. Gen., St. Paul, for State, Com'r of Public Welfare.

Daniel B. O'Leary, St. Paul, for LeZalla, et al.

Lawrence D. Cohen, Bloomington, for Harmony Nursing Home, Inc.

Beverly Balose, Minneapolis, for Gonsior et al.

Steven Wolfe, Michael Hagedorn, St. Paul, for Tholen, et al.

Kenneth R. Erickson, St. Paul, for Blickenderfer, et al.

Heard, considered and decided by POPOVICH, C.J., and NIERENGARTEN and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

The State of Minnesota, Department of Human Services (DHS) and the Commissioner of Human Services appeal from a summary judgment: (1) ordering DHS to pay Harmony Nursing Home and North St. Paul Nursing Home for care provided to medical assistance recipients residing in the nursing homes as of July 1, 1983; (2) providing that the nursing homes undertake a phased withdrawal from the medical assistance program; (3) setting the rates for the care provided to the medical assistance residents; (4) ordering the homes to maintain all licensure, life safety, civil rights and quality of care standards required by state and federal law; and (5) ordering that compliance with the order is deemed to satisfy all certification and other medical assistance requirements which allow the state to obtain federal financial participation. The State contends that (1) the court erred in ordering DHS to continue to pay the nursing homes by incorrectly applying 1983 amendments to a statute; (2) the court lacked authority to set rates; and (3) the court erred by deeming certain requirements for medical assistance participation fulfilled. We modify the order, and affirm as modified.

## FACTS

Harmony Nursing Home and North St. Paul Nursing Home are separate corporations. Leonard and JoAnne Jankowski are the primary shareholders of both. Each home provides care to medical assistance residents and private-pay residents. At the time these suits were initiated, medical assistance funds were paid for care of 55 of 149 residents at Harmony, and for some of the 47 residents at North St. Paul.

The medical assistance program for needy persons, with free choice of vendor, is cooperatively funded and administered by the state and federal governments. *See* 42 U.S.C. § 1396 *et seq.* and 42 CFR 433.1 et seq.; Minn.Stat. ch. 256B.

In 1976 the legislature enacted Minn. Stat. § 256B.48, subd. 1(a), the equalization law. Minn.Laws 1976, ch. 282, § 8. The law took effect in two stages. The first stage, which became effective immediately, prohibited nursing homes from charging private-pay residents more than ten percent above the rate established for medical assistance residents. The second stage became effective on July 1, 1978 and provided that a home could not receive medical assistance payments unless it agreed in writing not to charge its private-pay residents rates that exceed those approved by the state for medical assistance residents.

Before the second stage of the equalization law took effect several events took place. A suit was brought in federal district court challenging the validity of the law. *Minnesota Assn. of Health Care Facilities, Inc. v. Minn. Dept. of Public Welfare*, No. Civ. 3–77–467, slip op. at 15 (D.Minn. Apr. 26, 1983), *aff'd in part and rev'd in part*, 742 F.2d 442 (8th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). DHS notified participating nursing homes that they would be required to agree in writing to equalize their rates or they would not be eligible to receive medical assistance payments. DHS acknowledges that it made two exceptions to this strict position. It allowed a home to sign an agreement that permitted use of a private-pay rate which exceeded the medical assistance rate if the home agreed to escrow the excess pending the outcome of the federal litigation. DHS also continued to pay for any resident admitted to a home before July 1, 1978, even if the home did not agree to equalize its rates or sign an escrow agreement.

After the equalization law took effect, DHS allowed another exception: if a per-

son admitted to a non-complying facility as a private-pay resident after July 1, 1978 exhausted his or her financial resources, and if a transfer to another nursing home would seriously threaten the resident's health, DHS waived statutory requirements and paid assistance for the person.

Harmony and North St. Paul never agreed to equalize their rates or escrow overcharges. DHS continued to reimburse the homes for residents admitted to the home prior to July 1, 1978. In addition, it granted waivers to all but two of 35 to 40 residents who were admitted to the homes after July 1, 1978 and subsequently became eligible for medical assistance when they ran out of personal funds.

In the spring of 1983, the Minnesota Legislature added several amendments to the equalization law. Minn.Laws 1983, ch. 199, § 14. Specifically, the legislature: (1) removed the requirement of a written agreement not to charge unequal rates and instead simply prohibited the practice, (2) added a provision allowing a state or local agency, or a private-pay resident who is overcharged, to bring an action for treble damages and attorneys' fees, (3) required certain financial disclosures for rate setting purposes, and (4) required that all financial data submitted be made public.

Subsequently, DHS decided to discontinue granting individual waivers. This decision was challenged by another nursing home, Highland Chateau. A trial court upheld DHS's decision. On appeal, this court affirmed the holding, concluding that DHS's decision to discontinue its waiver policy on July 1, 1983 was made for rational reasons and was not an arbitrary exercise of discretion. *Highland Chateau v. Minnesota Dept. of Public Welfare*, 356 N.W.2d 804 (Minn.Ct.App.1984), *pet. for rev. denied*, (Minn. Feb. 6, 1985).

On May 31, 1983, Harmony and North St. Paul sent a letter to DHS inquiring about the status of residents who had received waivers, in light of the legislative amendments. The letter asked in part:

Therefore, if the waivers which have been granted on behalf of these patients are no longer effective, we must respectfully request that the Department obtain nursing services elsewhere, and that our provider agreement be terminated on the effective date of the new legislation.

In a letter to the nursing homes, DHS told the homes that if they continued to participate in the medical assistance program but did not equalize their rates, DHS would continue to pay benefits for residents admitted prior to July 1, 1978 and for those who had received waivers.

On July 22, Harmony wrote to DHS, indicating that it would not continue to participate in the medical assistance program. The Ramsey County Community Human Services Department then wrote to relatives of recipients residing at Harmony, stating that medical assistance funds could not pay for care at the home after November 30, 1983 because Harmony was withdrawing from the program. The county offered the families assistance in relocating the recipients to other participating homes.

Later, North St. Paul informed DHS that it did not wish to participate further in the medical assistance program. The Ramsey County agency sent a letter to the relatives of recipients at North St. Paul, similar to the one sent about Harmony residents.

After the Ramsey County agency sent notices to the relatives of the recipients at the two nursing homes, a number of lawsuits were initiated. Five residents of the two homes, the LeZalla plaintiffs, sued DHS, asserting that the impending transfers threatened the health and well-being and even the lives of the residents, and that the state must continue to pay for their care in the homes. DHS then brought a third party complaint against the nursing homes, claiming it had no authority to pay for the care of medical assistance residents in a nursing home which did not participate in the program. It asserted that if it was ordered to pay assistance to the homes, the homes should be ordered to continue participation in the program.

The trial court issued a temporary restraining order requiring DHS to continue

paying for the care of medical assistance recipients in the homes. A later temporary injunction embraced the same provisions as the temporary restraining order and required the homes to continue participation in the program.

The Gonsior plaintiffs are medical assistance residents of Harmony who brought a class action suit against Harmony and DHS, alleging that Harmony could not withdraw from participation in the program because it made commitments to residents who were initially private-pay patients that if they paid all of their private resources to the home, they could remain in the home on medical assistance.

The nursing homes sued DHS, seeking a declaration that they were no longer participants in the program and asking for an order requiring DHS to continue paying for the care of medical assistance residents in the homes.

Six medical assistance residents of North St. Paul, the Tholen plaintiffs, brought a class action suit against the nursing home, seeking to enjoin it from withdrawing from the program based on provisions of state and federal law and on commitments made to the residents and their families at the time the residents were admitted to North St. Paul.

Six residents of Harmony, the Blickenderfer plaintiffs, sued Harmony and DHS. Although none of the Blickenderfer plaintiffs were medical assistance recipients at the time of their suit, they alleged that the home was required to continue its participation in the program because of commitments made to them. The Blickenderfer plaintiffs also alleged that DHS should be prohibited from discontinuing the granting of waivers.

The trial court consolidated the cases. In its summary judgment order, it noted that the parties were very close to settlement and asked whether "the rights and the very life of the residents of these nursing homes [should] be protected by working out some system by which they can remain * * *." The court's unequivocal response was "[y]es, some reasonable disposition must be worked out to allow all of these problems to be met without doing violence to the law and to the lives of the people concerned." Based on settlement proposals, and resolving unsettled points, the court summarily judged that (1) the 1983 amendments to Minn.Stat. § 256B.48 are effective only with regard to persons entering the homes after July 1, 1983; and (2) the nursing homes can withdraw from the medical assistance program after a phase-out period and "such a phased withdrawal is necessary to protect the health, safety, and welfare of the Medical Assistance patients and those persons who reside at the nursing homes on July 1, 1983 * * *" and (3) the acceptance by the nursing homes of medical assistance funds for the residents since July 1, 1983 does not make them subject to the provisions of Minn.Stat. § 256B as amended by chapter 199.

The court required the homes to maintain all licensure, life safety, civil rights, and quality of care standards required by state and federal law. The court ordered that compliance with its order is deemed to satisfy all certification requirements, including that of a provider agreement, for participation by the parties in the medical assistance program and Title XIX of the Social Security Act. The court further provided a system for calculating the rates to be paid to the homes.

The State now appeals.

### ISSUES

1. Did the trial court err by summarily judging that the 1983 amendments to Minn. Stat. § 256B.48 are effective only with regard to persons entering the two homes after July 1, 1983?

2. Did the trial court properly provide an interim rate structure?

3. Should this court order the nursing homes to sign provider agreements?

### ANALYSIS

All of the parties moved for summary judgment. Rule 56.03 sets forth the re-

quirements which must be met before a summary judgment may be ordered. In pertinent part, the rule provides summary judgment shall be rendered when:

> The pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to judgment as a matter of law.

Minn.R.Civ.P. 56.03.

In this case the parties agree that there are no genuine issues of material fact. All agree that the health and welfare of the residents are threatened if they are moved. In the words of DHS:

> [T]he best interests of the individual residents would be threatened by such transfers. * * * It is uncontroverted that the emotional well-being and the physical health of these residents would be better served if they were allowed to stay in the nursing homes where they now reside.

Since there was no issue as to material fact, the trial court properly entered a summary judgment.

### 1.

The State contends that the trial court erred by ordering DHS to continue to pay the nursing homes, incorrectly applying the 1983 amendments to Minn.Stat. § 256B.48. Minn.Laws 1983, ch. 199, § 14.

After the 1983 amendments were enacted, both Harmony and North St. Paul informed DHS that it wished to withdraw from participation in the medical assistance program. The trial court held that, because it is necessary to protect the admittedly vulnerable residents residing in the homes as of July 1, 1983, the 1983 amendments to Minn.Stat. § 256B.48 are effective only with regard to persons entering the homes after July 1, 1983. It therefore ordered the nursing homes to withdraw from the medical assistance program on a phased out basis.

We begin with the principle that

> [a] statute is to be construed according to the legislative intent, which is to be sought in the language used, in the light of the subject matter, the purpose of the statute, the occasion and necessity for the law, and the consequences of a particular interpretation.

*State v. Olson*, 325 N.W.2d 13, 19 (Minn. 1982) (quoting *Grudnosky v. Bislow*, 251 Minn. 496, 498, 88 N.W.2d 847, 850 (1958)).

The legislature's purpose in enacting both the medical assistance program and the equalization component can be found both within the laws and in the cases interpreting them. Congress directed the states to design their medical assistance programs so that care and services would be provided "in a manner consistent with simplicity of administration and in the best interests of the recipients." 42 U.S.C. § 1396a(19) (1982). Chapter 256B was designed to benefit needy persons. Minn. Stat. § 256B.01 (1984). When the legislature enacted Minn.Stat. § 256B.48, the equalization law, it intended to enhance the public good. *Highland Chateau v. Minnesota Department of Public Welfare*, 356 N.W.2d at 809. It "furthers strong societal purposes" and: (1) may reduce discrimination against Medicaid recipients in gaining entry to nursing homes by eliminating the incentive to discriminate; (2) tends to alleviate the "stigma" attached to receiving welfare benefits; (3) permits private pay residents to stretch their savings farther and thereby stay off welfare; (4) promotes the fundamental notion of fairness that one should pay equal rates for equal services; and (5) eases the resentment of private pay patients directed toward Medicaid recipients. *Minnesota Assn. of Health Care Facilities, Inc. v. Minn. Dept. of Public Welfare*, slip op. at 15, 16.

The equalization law has no provision which directly addresses the situation in this case: What happens when a nursing home withdraws from the medical assistance program, when transfers of the residents would threaten their best interests, and when the emotional well-being and physical health of recipients would be better served if they were allowed to stay in the nursing homes where they now reside?

■ A statute is to be construed not only according to legislative intent but also according to the consequence of a particular interpretation. *State v. Olson*, 325 N.W.2d at 19. Here the trial court considered the intent of the medical assistance law and the consequences of both the State's interpretation and the residents' interpretation. Under the State's interpretation, every medical assistance resident, no matter what his or her state of health, would be forced to move. Under the residents' interpretation, those admitted to the nursing homes before the homes decided to withdraw could remain.. The court then held that the 1983 amendments can only be applied with regard to persons entering Harmony and North St. Paul after July 1, 1983 and ordered the homes to withdraw from the medical assistance program on a phased out basis.

The trial court's interpretation of the statute is correct. Under the State's interpretation, the very group that the statutes were designed to benefit would be endangered. Such a result would be absurd and contrary to the principle that statutory language must be construed "to avoid reaching an absurd or unreasonable result." *See Spaeth v. City of Plymouth*, 344 N.W.2d 815, 822 (Minn.1984).

■ The State ignores a basic underpinning of the equalization law: participation in the medical assistance program by a nursing home is voluntary. *Minnesota Ass'n. of Health Care Facilities v. Minn. Dept. of Public Welfare*, 742 F.2d 442 (8th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). Harmony and North St. Paul have every right to withdraw from the program since they do not wish to comply with the conditions for participation. Given their withdrawal, the acknowledged vulnerability of their patients, and the lack of statutory guidance in the exact circumstance, the trial court necessarily had to interpret the statute according to legislative intent and with due consideration of the consequences of the interpretation. It did a meritorious job.

■ The State directs our attention to several 1984 amendments to Chapter 256B and argues that these amendments show a clear legislative intent to force residents to move from nursing homes which wish to withdraw from the medical assistance program.

Minn.Laws 1984 ch. 641, § 13, codified at Minn.Stat. § 256B.25 (1984), provides that with several exceptions the payment of state or county funds to nursing homes shall be made only through the medical assistance program. Here, the nursing homes are participating in the program, albeit to a limited extent, until the phased withdrawal is complete. We see no inconsistency between this statute and the trial court's decision.

Minn.Laws 1984 ch. 641, § 13, codified at Minn.Stat. § 256B.25, subd. 1 (1984), provides that payments may not be made to nursing homes unless they are certified. After ordering the homes to maintain applicable safety, etc. standards, the trial court deemed the certification requirement satisfied in order to protect federal funding. Since the nursing homes were ordered to care for their residents admitted prior to July 1, 1983, in spite of their wish to withdraw from the medical assistance program, the court's action was appropriate. The court's refusal to order the nursing homes to obtain the same certification as fully participating providers is not different from its refusal to order them to comply with identical procedures for rate setting, including the disclosure of financial data. If they were required to satisfy the same requirements as voluntary providers, the court would, in effect, be requiring them to fully participate in a voluntary program.

■ The State also directs our attention to Minn.Laws 1984, ch. 641, § 12, codified at Minn.Stat. § 144A.31, subd. 4 (1984), as support for its contention that the legislature intends to force residents to move from a nursing home wishing to withdraw from the medical assistance program. This section provides for relocation plans "when residents are to be discharged" because of a change in certification, closure, or loss or

termination of the facility's medical assistance provider agreement. This section addresses those situations when, because of some inadequacy on the part of facility, it is in the best interests of the residents that they be moved. The legislature has not stated that it intends relocation of residents when a move admittedly threatens their best interests. We decline to read such a provision into the statute.

■ Finally, the State cites Minn.Laws 1984, ch. 641, § 23, codified at 256B.48, subd. 1 (1984). This amendment provides that if the commissioner determines a nursing home is not eligible for reimbursement, the commissioner may authorize the nursing home to receive reimbursement on a temporary basis until the residents can be relocated. Rather than supporting DHS's position, this statute supports the trial court's decision by recognizing the need for flexibility devices. More importantly, the same reasoning that applies to Minn.Stat. § 144A.31, subd. 4, applies here. The legislature has not stated favor for relocating residents when relocation threatens their best interests. We again decline to read such a provision into the statute.

### 2.

■ DHS contends that the trial court was without authority to provide a rate structure for the nursing homes. Normally rates are based upon the reported costs and financial data supplied by the nursing home. Here, the nursing homes sought to withdraw from the medical assistance program. If a nursing home does not voluntarily participate in the medical assistance program it is not obligated to supply DHS with its costs and financial data. The court ordered the homes to participate on a phased out basis. The nursing homes did not appeal the order. Under the circumstance, the court could not order the disclosure of costs and financial data. Such an order would be tantamount to forcing the homes to participate in a voluntary program. The court exercised its equitable powers and supplemented the law since

statutes do not provide for rates under the circumstances presented by this case.

> Equity, which is not a distinct and self-sufficient juristic system designed to overrule or correct other law, functions as a supplement to the rest of the law where its remedies are inadequate to do complete justice.

*Swogger v. Taylor,* 243 Minn. 458, 464, 68 N.W.2d 376, 382 (1955).

■ Here, the trial court neither overruled nor corrected other law, but supplemented it. The standard of review in cases involving equitable relief is whether the trial court abused its discretion. *City of Cloquet v. Cloquet Sand and Gravel, Inc.,* 312 Minn. 277, 279, 251 N.W.2d 642, 644 (1977). In implementing the medical assistance statute, the trial court provided a method for calculating rates when there was none. DHS makes no objection as to the method chosen. We find no abuse of discretion.

### 3.

DHS requests this court to order the nursing homes to sign a provider agreement and to maintain its medical assistance certification, if we affirm the trial court's order. DHS speculates that without such agreements, it may lose the federal funding that is now provided for Harmony and North St. Paul.

The nursing homes concede that federal law conditions payments to states participating in the federal Medicaid program upon the state's ensuring that nursing homes which are paid federal funds maintain certain minimum standards including a signed provider agreement. In their brief the homes indicate a willingness to maintain a limited provider agreement sufficient to protect federal financial participation and lasting for the duration of the phased withdrawal.

■ The trial court specifically stated that it intended its order to satisfy all requirements necessary to obtain federal financial participation. However, it did not explicitly order the nursing homes to sign a provider agreement which would be suffi-

cient to protect federal financial participation. We modify the district court's order to require the nursing homes to sign a provider agreement sufficient to protect federal financial participation and lasting for the duration of the phased withdrawal.

DHS also requests this court to order the nursing homes to maintain certification. The trial court's order specifically addresses the applicable licensure, safety, quality of care and civil rights standards necessary to maintain certification. It ordered that if the standards were maintained, certification was satisfied. It did so with the intention of protecting federal financial participation. If the trial court's order proves to be inadequate, DHS can apply to it for relief.

## DECISION

The trial court did not err by summarily judging that under the circumstances of this case the 1983 amendments to Minn. Stat. § 256B.48 are effective only with regard to persons entering Harmony and North St. Paul after July 1, 1983.

The trial court properly provided an interim rate structure.

The nursing homes must sign a provider agreement sufficient to protect federal financial participation and lasting for the duration of the phased withdrawal.

Affirmed as modified.