**In re Bengt Val THULIN.**

**No. C0–02–2033.**

Court of Appeals of Minnesota.

April 29, 2003.

Tim Aldrich, Grand Rapids, MN, for appellant Thulin.

John J. Muhar, Itasca County Attorney, Mary Evenhouse, Assistant County Attorney, Grand Rapids, MN, for respondent county.

Considered and decided by HARTEN, Presiding Judge, PETERSON, Judge, and HALBROOKS, Judge.

## OPINION

HALBROOKS, Judge.

Appellant contends that (1) the district court did not have jurisdiction to consider his continued commitment because his initial commitment was being appealed to this court; (2) the court did not have clear and convincing evidence that he posed the requisite likelihood of harm under Minn. Stat. § 253B.02, subd. 13 (2002); (3) less restrictive treatment alternatives were available; and (4) there was no clear and convincing evidence that appellant did not have the capacity to decide whether to take neuroleptic medication. Because jurisdiction exists and the district court properly made findings based on clear and convincing evidence, we affirm.

## FACTS

On April 24, 2002, the district court issued an order finding appellant Bengt Thulin to be mentally ill under Minn.Stat. ch. 253B (2002), and committing him to the Brainerd Regional Treatment Center. The court also ordered the imposition of neuroleptic medication for a period of six months. Appellant challenged the order, and on October 22, 2002, this court affirmed the district court. The day before this court's opinion was released, a review hearing was held to determine the need for appellant's continued commitment pursuant to Minn.Stat. § 253B.12, subd. 4.

The district court received testimony from two expert witnesses at the review hearing. The clinical director of the

Brainerd Regional Treatment Facility, Ted Matzen, M.D., a psychiatrist, testified that appellant has a delusional disorder, persecutory type. He testified that continued commitment is necessary for the protection of appellant and others because

[g]iven the nature of his mental illness and his lack of the response to treatment that we've offered here in the last six months, it is likely that he will continue to generate persecutory delusions and possibly act on those as what he would perceive as being his own defense and that action would—might be violent.

Dr. Matzen further testified that he had considered alternatives to involuntary commitment but that they would not be viable. In weighing the risks and benefits of the neuroleptic medication, he concluded that the benefits outweighed the risks, although he estimated only a 50% possibility that appellant would experience a partial response from the medication. But Dr. Matzen noted that "the probability is high that if anything is going to help, it's going to be one of the antipsychotic medications," and that appellant would be closely monitored to minimize any risk from side-effects such as sedation, light headedness, suppression of white blood cells in bone marrow, muscle rigidity, muscle contraction, and others. Dr. Matzen also opined that appellant lacked capacity to give informed consent for the administration of medications, because appellant remained unwilling to take medication, possibly did not comply with orders to take medication, and had no insight into his mental illness.

Jay Lucas, Ph.D., also testified, based on his review of appellant's file and an interview with appellant that ended after seven minutes when appellant abruptly left. Dr. Lucas stated that appellant's mental illness continued and that he continued to be a risk to himself and to others. He noted that appellant was not ra-tional in his refusal to take medications and to otherwise neglect his medical needs by his refusal to allow doctors to take his vital signs. Dr. Lucas also provided his opinions that there was no appropriate alternative to commitment for appellant and that the benefits of medication outweighed the risks.

The district court ordered that appellant's commitment continue for not more than 12 months and authorized the administration of neuroleptic medication by injection, if necessary, and the enforcement of necessary medical care such as monitoring vital signs and drawing blood. This appeal follows.

## ISSUES

I.   Did the district court retain jurisdiction over appellant's continuing commitment?

II.  Was the record sufficient to support the statutory requirements for continued commitment?

III. Was the district court's finding that commitment to the Brainerd Regional Treatment Center was the least restrictive alternative clearly erroneous?

IV.  Did the record provide clear and convincing evidence to support the district court's finding that appellant lacked the capacity to make determinations regarding neuroleptic medications?

## ANALYSIS

### I.

As a preliminary matter, appellant questions the district court's jurisdiction because his appeal from the initial commitment order was pending at the time of the hearing for appellant's continued

commitment.[1] Existence of subject-matter jurisdiction is a question of law, which we review de novo. *Neighborhood Sch. Coalition v. Indep. Sch. Dist. No. 279*, 484 N.W.2d 440, 441 (Minn.App.1992), *review denied* (Minn. June 30, 1992).

Appellant correctly states that the jurisdiction of a district court may be suspended during an appeal. Minn. R. Civ.App. P. 108.03 provides that perfection of an appeal

> shall stay all further proceedings in the trial court upon the judgment or order appealed from or the matter embraced in it; but the trial court may proceed upon any other matter included in the action and not affected by the judgment or order from which the appeal is taken.

Codifying caselaw, Minn. R. Civ.App. P. 108.01, subd. 1, states that

> [t]he trial court retains jurisdiction as to matters independent of, supplemental to, or collateral to the order or judgment appealed from, and to enforce its order or judgment.

*See Spaeth v. City of Plymouth*, 344 N.W.2d 815, 824 (Minn.1984) (quoting *State v. Barnes*, 249 Minn. 301, 302–03, 81 N.W.2d 864, 866 (1957)) (concluding that "the jurisdiction of a trial court is *suspended* only to those matters necessarily involved in the appeal").

The question before this court is whether issuing an order for continued commitment under Minn.Stat. § 253B.12, subd. 4 (2002), is independent of the initial commitment under Minn.Stat. § 253B.09, subd. 1(a) (2002), and, therefore, a proper exercise of the district court's jurisdiction. In *Spaeth*, the supreme court held that a claim of attorney fees and expert fees

should be treated as an independent matter. 344 N.W.2d at 825. It reasoned that the matter was independent because the court need not reconsider the merits of the issue on appeal to reach conclusions regarding fees, and as a practical matter, if the district court had not entered the order setting the fees, the appellate court would have been required to remand for further proceedings if and when it upheld the district court on the merits. *Id.; but see Hasan v. McDonald's Corp.*, 377 N.W.2d 472, 473–74 (Minn.App.1985) (finding no jurisdiction for the district court's order based on the parties' stipulation where "the contents of this record on appeal from summary judgment are intertwined with the summary judgment being appealed").

On the one hand, the two orders considered here are closely related because, if the appellate court were to reverse the initial commitment, it would end the case, subject to the state's right of appeal. On the other hand, there is a different standard of proof and a new set of facts that the district court examines in making its decision under Minn.Stat. § 253B.12, subd. 4. Like the issue of fees in *Spaeth*, the district court here does not have to consider the merits of any issue on appeal in making its decision regarding continuing commitment.[2] On that basis, we conclude that a determination of continued commitment is supplemental to and independent of the initial order of commitment being appealed, and jurisdiction on that issue remains in the district court.

## II.

■ Appellant claims that the district court lacked evidence to support its contin-

---

1. Specifically, the court held a continued-commitment hearing on October 21, 2003. This court affirmed the initial commitment on October 22, 2002. The trial court issued its order October 23, 2002.

2. Moreover, the court noted that the mandated review of the initial commitment order under Minn.Stat. § 253B.12, subd. 4, is to protect the appellant.

ued commitment decision and failed to comply with the commitment statute by relying on evidence of appellant's potential violence to himself or others. On appeal, our review is limited to an examination of the district court's compliance with the statute, and the commitment must be justified by findings based on the evidence at the hearing. Minn.Stat. § 253B.09, subd. 2 (2002); *In re Knops,* 536 N.W.2d 616, 620 (Minn.1995). "Where the findings of fact rest almost entirely on expert testimony, the trial court's evaluation of credibility is of particular significance." *Knops,* 536 N.W.2d at 620 (citation omitted). We review de novo whether there is clear and convincing evidence in the record to support the district court's conclusion that appellant meets the standards for commitment. *In re Linehan,* 518 N.W.2d 609, 613 (Minn.1994).

Contrary to appellant's analysis, the district court may continue an involuntary commitment under a less stringent standard than an initial commitment when it finds, by clear and convincing evidence, that

> (1) the person continues to be mentally ill, * * *; (2) involuntary commitment is necessary for the protection of the patient or others; and (3) there is no alternative to involuntary commitment.

> In determining whether a person continues to be mentally ill * * * the court need not find that there has been a recent attempt or threat to physically harm self or others * * *. Instead, the court must find that the patient is likely to attempt to physically harm self or others * * * unless involuntary commitment is continued.

Minn.Stat. § 253B.12, subd. 4. Here, the court heard the opinions of two experts that appellant continues to be mentally ill. Dr. Lucas testified that appellant "continues to have very strong delusions that

people are trying to harm him." The delusions include a fear of police actions against him and a fear for his life. Dr. Lucas also testified that the delusions cause appellant to get into conflicts. Dr. Matzen testified that appellant's continued commitment is necessary for his protection and the safety of others because it is likely that appellant will continue to generate persecutory delusions and may possibly act violently in response to them. Additionally, the day before the district court issued its order, this court concluded that the district court's determination that appellant was mentally ill was supported by the evidence and was not clearly erroneous. *In Re: Bengt Thulin,* No. C0–02–864, 2002 WL 31371591 (Minn.App. Oct.22, 2002). This evidence in the record is sufficient to support the statutory requirements for continued commitment.

### III.

Appellant argues that the Brainerd treatment center is not the least restrictive alternative available to him. When ordering a continued commitment, Minn.Stat. § 253B.12, subd. 7 (2002), requires that the findings of fact and conclusions of law state that "less restrictive alternatives have been considered and rejected by the court" and that "[r]easons for rejecting each alternative shall be stated." In reviewing whether the least restrictive treatment program that can meet the patient's needs has been chosen, an appellate court will not reverse a district court's finding unless clearly erroneous. *In re Kellor,* 520 N.W.2d 9, 12 (Minn.App. 1994), *review denied* (Minn. Sept. 28, 1994).

In its findings of fact, the district court concluded that

> [a]lternatives to the disposition herein have been considered and rejected as follows: Voluntary out-patient and infor-

mal admissions to a treatment facility have been considered by professionals. It is the opinion of both Dr. Lucas and Dr. Matzen that these are not reasonable alternatives to commitment at this time.

In reaching this conclusion, the district court heard testimony from Dr. Matzen that he had considered alternatives to involuntary commitment, but that "[t]here is no other outpatient program that I'm aware of that could safely house him right now." Dr. Lucas concurred. Because the trial court heard evidence from two experts who both recommended the same treatment facility and because the court considered alternatives, the district court's finding is not clearly erroneous.

### IV.

■ Appellant challenges the district court's determination that he lacked the capacity to refuse to take neuroleptic medication. Court approval is required to administer neuroleptic medication to a person who refuses it. Minn.Stat. § 253B.092, subd. 8(a) (2002); *Jarvis v. Levine*, 418 N.W.2d 139, 144 (Minn.1988). Minnesota law presumes that a patient has the capacity to decide whether to take neuroleptic medication. Minn.Stat. § 253B.092, subd. 5(a) (2002). But if a patient refuses the medication, the court must first determine whether the patient has capacity to so decide. Minn.Stat. § 253B.092, subd. 8(a). To determine whether the patient has capacity, the court must consider the following factors:

(1) whether the person demonstrates an awareness of the nature of the person's situation, including the reasons for hospitalization, and the possible consequences of refusing treatment with neuroleptic medications;

(2) whether the person demonstrates an understanding of treatment with neuroleptic medications and the risks, benefits, and alternatives; and

(3) whether the person communicates verbally or nonverbally a clear choice regarding treatment with neuroleptic medications that is a reasoned one not based on delusion, even though it may not be in the person's best interests.

Minn.Stat. § 253B.092, subd. 5(b) (2002).

In examining the statutory factors, there is sufficient evidence in the record to support the district court's finding that appellant lacked capacity to make decisions about neuroleptic medication because nothing had changed with respect to that issue since the court's initial order dated April 24, 2002. The record evidences that appellant did not demonstrate an awareness of his situation because, according to the experts, appellant has no insight into his mental illness. The court considered evidence that Dr. Matzen had weighed the risks and benefits of the drugs and found the benefits to outweigh the risks because

the probability is high that if anything is going to help it's going to be one of the antipsychotic medications, and appellant would be closely monitored to minimize any risk.

Nonetheless, appellant recognized no benefits to the drug therapy. Although appellant testified that he had read the Physicians Desk Reference concerning the drugs suggested for him and communicated that he found the risks associated with them unacceptable, Dr. Lucas testified that it was not rational for appellant to neglect his medical needs by refusing medication and by refusing to allow his vital signs to be taken. The record provides clear and convincing evidence to support the district court's finding that appellant lacked the capacity to make determinations concerning neuroleptic medications.

## DECISION

The district court had jurisdiction to make a determination on appellant's continued commitment because a continued-commitment decision is independent of and supplemental to an initial order of commitment. Additionally, the district court's findings that appellant continued to be mentally ill, that there was no less restrictive alternative to commitment, and that appellant lacked capacity to make decisions about neuroleptic medications are supported by the record and are not clearly erroneous.

**Affirmed.**