## WALLACE W. ORFIELD AND ANOTHER v. HOUSING AND REDEVELOPMENT AUTHORITY OF THE CITY OF ST. PAUL.

232 N. W. 2d 923.

September 12, 1975—No. 44898.

*Paul Skjervold,* for appellants.

*Neil M. Meyer, Daniel B. Johnson,* and *Jack F. Sjoholm, Jr.,* for respondent.

Heard before Otis, Todd, and MacLaughlin, JJ., and considered and decided by the court en banc.

PER CURIAM.

This is an inverse condemnation proceeding in which petitioners, Wallace W. and Lucretia M. Orfield, seek to compel respondent, Housing and Redevelopment Authority of the City of St. Paul, to acquire a certain parcel of real estate owned by petitioners and to pay just compensation therefor. Petitioners contend that respondent's activities in the neighborhood of petitioners' property constituted a direct and substantial invasion of their property rights which caused a decrease in value of their property and a de facto taking of the property. The trial court found that petitioners were not entitled to the relief sought. We affirm.

Petitioners are residents of Edina, Minnesota, and have owned the property in question since March 1, 1939. The property is located within the boundaries of the Summit-University Urban Renewal Area, and is improved with a 41-unit apartment building, which was constructed sometime between 1879 and 1889. Mr. Orfield testified at trial that from 1939 to 1968 the building was very close to full occupancy and that prior to 1968 there was little vandalism in the neighborhood.

From 1965 to 1968, respondent housing authority surveyed the area known as the Summit-University Urban Renewal Area and inspected virtually all of the 4,200 structures located within the area. The purpose of the survey was to discover sufficient evidence of blight and deterioration to justify the expenditure of Federal funds for urban renewal. The various components of each building were inspected, and each building was classified according to its degree of deterioration. If a building contained two or more major deficiencies in one of its structural or mechanical components, it was identified as substandard. Approximately 17 percent of the 4,200 structures in the area were classified as substandard, and petitioners' property was one of the buildings so classified. Respondent's survey also revealed that the area had an incidence of crime, fire calls, and juvenile delinquency which was much higher than other areas of the city in proportion to the population of the area. Respondent also determined that the area was lacking in open recreational space and needed new streets.

Respondent's survey was used to aid in the preparation of an application for a grant of Federal funds for an urban renewal project. It was anticipated that the Federal government would make a lump-sum grant which would enable respondent to put into effect a complete program of property acquisition and family relocation. Because of the desire to acquire certain particularly defective properties immediately, respondent also prepared and submitted to the Federal government an early land acquisition application. Under the Early Land Acquisition Pro-

gram, respondent requested a grant of Federal funds to acquire 251 identified parcels and 100 unidentified parcels of land in the area. The 251 identified parcels, which were considered the parcels most in need of redevelopment, did not include petitioners' property. In November 1968, respondent began acquiring properties under this Early Land Acquisition Program.

Before the application for the lump-sum grant for the entire project was submitted to the Federal government, respondent was informed that the government would no longer make lump-sum grants, but would instead fund respondent's activities on a yearly basis with no funds guaranteed for subsequent years. This program was called the Neighborhood Development Program. Because respondent could no longer be sure of obtaining all the funds it needed to acquire all the properties it desired, it created a Hardship Acquisition Program. Under this program, owners of substandard buildings could request that respondent acquire their property. Because of the large number of requests, the substandard properties were placed in four priority categories: (A) Owner-occupied, single-family dwelling; (B) tenant-occupied, single-family structure; (C) multiple-family buildings; and (D) commercial buildings. In June 1969, a letter was sent to all owners of property in Category A informing them that they could request acquisition. This letter was not sent to owners of property in Categories B, C, and D; and therefore petitioners, whose property was in Category C, did not receive one.

In March 1969, petitioners received a letter from the office of the St. Paul city architect informing them that their apartment building had several code violations and that, if these violations were not corrected, the building would not receive a certificate of occupancy. On August 26, 1969, as a result of the city architect's letter, petitioners submitted a hardship acquisition request to respondent. In response, petitioners received a letter from respondent which stated, in part, as follows:

"Upon receipt of your hardship acquisition questionnaire, dated August 26, 1969, your property was placed on our Category

C Acquisition List. Those in Category C are owners that live outside of the Summit-University area.

"As we advised you at the time of your visit, your request will be given consideration at the time Federal funds are made available for continuance of this program. We strongly urge that your property be maintained until we are able to negotiate for its purchase due to the fact that the payment we are authorized to make is based upon the condition of the property at the time of its acquisition."

In December 1970, several months after petitioners received respondent's letter, the St. Paul city architect wrote another letter to petitioners stating that none of the several code violations had been remedied and again warning that unless the violations were corrected a certificate of occupancy for the apartment building would not be issued.

Respondent never acted on petitioners' request and never took any action to acquire the subject property. It did, however, acquire all property in Categories A and B, and all Category C property with six units or less, which included acquisition of property on either side of petitioners' property.

Mr. Orfield testified that after 1968, when respondent began acquiring property, tenants who had been in the building for years began to leave and that the new tenants were drunkards and "people that were on dope." He also testified that the rate of vandalism went up and that he had trouble getting caretakers because of the risk of being attacked. Orfield testified that his profits from the building began to drop in 1968 and 1969 and that in 1971 and 1972 he sustained substantial losses. On January 19, 1973, petitioners boarded up their building.

The sole issue for our decision is whether respondent's activities in the neighborhood of petitioners' property constituted such a direct and substantial invasion of their property rights, and consequent diminution in their property value, that it was in fact a taking of the property. Both the United States and the Minnesota Constitutions prohibit the taking of property for public use

without just compensation.[1] Specifically, the Minnesota Constitution requires compensation whenever property is taken, destroyed, or damaged for public use.

In Alevizos v. Metropolitan Airport Comm. 298 Minn. 471, 487, 216 N. W. 2d 651, 662 (1974), we considered the question of inverse condemnation resulting from the flight of airplanes over petitioners' property:

"The test, then, that we prescribe will give relief to any property owner who can show a direct and substantial invasion of his property rights of such a magnitude he is deprived of the practical enjoyment of the property and that such invasion results in a definite and measurable diminution of the market value of the property."

However, Alevizos is inapplicable to the facts of this case. The trial court, after hearing the evidence adduced by both parties, made the following findings of fact:

"The apartment building at 697-703 Laurel Avenue owned by the Petitioner has never been scheduled or approved for acquisition, nor have eminent domain proceedings against said building ever been authorized, by any resolution of either Respondent's Board of Commissioners or the City Council of the City of St. Paul, Minnesota.

"Respondent has never represented to Petitioner that Petitioner's apartment building would be acquired by Respondent, and has in fact advised Petitioner at all times material to this action that the apartment building was not scheduled for acquisition by Respondent.

"Respondent did not by its acts or by the acts of its employees or agents cause tenants of the apartment building to vacate.

"Respondent did not by its acts or by the acts of its employees or agents commit a direct physical invasion of the subject property at any time material to this action.

"Respondent did not by its acts or by the acts of its employees

---

[1] U. S. Const. Amend. V; Minn. Const. art. 1, § 13.

or agents place any legal restraints on Petitioner's use of the subject property at any time material to this action.

"Respondent or its employees and agents did not deprive Petitioner of the substantial use and benefit of the apartment building or interfere with Petitioner's right to receive rentals from tenants living in the apartment building at any time material to this action.

"Respondent did not by its acts or by the acts of its employees or agents assert dominion or control over the subject property at any time material to this action.

"Respondent and its employees and agents did not act in bad faith in its dealings with Petitioner respecting the subject property."

Our review of the record clearly supports these findings of the trial court. Further, it is apparent from the record that the Summit-University Urban Renewal Area Project arose out of the decline of the area, and the decline was not the result of the urban renewal project. Therefore, much of the deterioration of the neighborhood complained of by petitioners was under way prior to the housing authority activity and, indeed, might well have progressed even faster had there been no renewal project.

However, in response to the precise issue raised by petitioners, we hold, as have other courts in which the issue has arisen, that economic loss caused by the altered character of a neighborhood due to normal activities in connection with an urban renewal project, without more, does not constitute a de facto taking of the property in a constitutional sense. Fluctuations in value of property which may occur by reason of activity undertaken in connection with a government project of this type are incidents of ownership, and a reduction in value so occurring cannot be considered a taking in a constitutional sense. See, Sayre v. City of Cleveland, 493 F. 2d 64 (6 Cir.), certiorari denied, 419 U. S. 837, 95 S. Ct. 65, 42 L. ed. 2d 64 (1974); Woodland Market Realty Co. v. City of Cleveland, 426 F. 2d 955 (6 Cir. 1970); Danforth v. United States, 308 U. S. 271, 60 S. Ct.

231, 84 L. ed. 240 (1939) ; City of Buffalo v. J. W. Clement Co. 28 N. Y. 2d 241, 321 N. Y. S. 2d 345, 269 N. E. 2d 895 (1971). Applying this standard to the facts of this case compels us to conclude that respondent's activities did not constitute a taking of petitioners' property.

It may well be that abuse of the power of eminent domain when that abuse is specifically directed against a particular parcel could constitute a de facto taking. See, e.g., Haczela v. City of Bridgeport, 299 F. Supp. 709 (D. Conn. 1969). However, that is not the case here. Petitioners cite the quoted letter from respondent as evidence of such abuse. In our judgment, the letter was nothing more than a good-faith response by respondent to petitioners' request that their property be taken, and the letter promised nothing more than consideration of the request if funds became available. Respondent used its available funds as it deemed best for the overall success of the Summit-University project, and we find no abuse of its discretion in the use of those funds.

Affirmed.