**FITGER BREWING COMPANY, Respondent,**

v.

**STATE of Minnesota, et al., Appellants.**

Nos. C4–87–1031, C8–87–1307.

Court of Appeals of Minnesota.

Dec. 8, 1987.

Review Denied Feb. 23, 1988.

William P. O'Brien, Richard J. Leighton, Duluth, for respondent.

Hubert H. Humphrey, III, Atty. Gen., Sherry A. Enzler, Sp. Asst. Atty. Gen., Lloyd J. Moosbrugger, Asst. Atty. Gen., St. Paul, for appellants.

Heard, considered and decided by WOZNIAK, P.J., and CRIPPEN and STONE*, JJ.

## OPINION

CRIPPEN, Judge.

The question presented in this case is whether the trial court erred in awarding damages to respondent Fitger Brewing Company in an inverse condemnation action, where the state never acquired or physically took the property. We reverse.

## FACTS

a. Background: events before 1970.

John Ferris owned and operated respondent Fitger Brewing Company in Duluth in a brewery building over a hundred years old located next to Lake Superior. The State of Minnesota, an appellant in this case, was planning a route for I–35 through Duluth beginning in the late 1950's. The state designed several plans for a segment of the interstate between 1958 and 1968. After all the potential plans were considered and rejected, in late

---

* Acting as judge of the Court of Appeals by ap-    pointment pursuant to Minn. Const. art. 6, § 2.

1969, the Minnesota Department of Transportation began exploring a new alignment for I–35 which would have required taking some of the Fitger facilities.

In September 1969, John Ferris was notified by the Minnesota Pollution Control Agency (PCA) that Fitger was to either install certain pollution control devices or terminate the brewery operation. Ferris corresponded with the PCA about the problem, and stated he intended to fund the improvements because Fitger did not have the capital to do so. The cost of the improvements was estimated to be $100,000.

b. Negotiations between Fitger and the state: 1970–1972.

In a January 12, 1970 letter, the PCA advised Fitger that construction or installation must be completed by May 26, 1973, and that the PCA would be issuing formal orders to compel compliance within that time unless the parties could agree to a voluntary stipulation. Ferris testified that he regarded that as a "pressure letter."

In December 1969, Ferris wrote to Les Miller, District Engineer for the Duluth District of the transportation department, to inquire about the proposed new plan for I–35 that would involve Fitger property. In the letter, Ferris said that Fitger was currently considering major pollution control expenditures and he expressed concern about possible highway plans that could affect his investment in improvements. In a letter dated December 18, 1969, Miller informed Ferris that the state was considering an alternate alignment for the highway that would involve some of the Fitger property. Ferris then met with Miller. Miller told him the state was considering the alternate alignment and Ferris explained that the affected property was integral to the brewery operation. Miller told Ferris a decision was expected by mid-summer.

On May 7, 1970, Fitger entered into a stipulation with the PCA, agreeing that Fitger would complete construction of the necessary facilities by December 31, 1970.

On September 25, 1970, Ferris sent a letter to Miller notifying him that Fitger,

under pressure from the PCA, had agreed to correct its pollution problems by December 31, 1970; that Fitger had begun preliminary work on the improvements and that the brewery wanted assurance that the highway plans would not involve the plant property. Ferris asked to be advised when the transportation department expected plans to be finalized. It was evident to the state that Fitger preferred to make necessary improvements and remain open, rather than close down because of highway construction.

On November 9, 1970, the Duluth City Council gave preliminary approval to the state's highway plan. The next day Miller wrote to Ferris, stating that the state had abandoned one plan which involved the brewery's railroad right of way, and was now considering a proposal that would require taking much of the brewery property. The department intended to hold a series of meetings with other groups in the city over the next month, and the letter stated no final date for decision was set, but Miller hoped it would be by about February 1, 1971.

At approximately the same time as the correspondence between Ferris and Miller, several newspaper articles were published locally on the proposed highway plans. An article in the Duluth News–Tribune on November 10, 1970, quoted Miller and another transportation department official stating that the newest development in plans "will mean 'taking' (condemning) everything on the south side of Superior Street from the Fitger Brewery to Eighth Avenue East." Ferris testified that there was a similar announcement in the Duluth Herald.

In late 1970, the city of Duluth requested that an independent consultant be hired to evaluate the need for and location of an interstate highway. The city hired the Eckbo firm as a consultant in December 1971, and it suspended decisions on I–35 pending Eckbo's report. During the course of the study, Eckbo held over 60 public hearings, most of which were attended by Ferris.

On November 13, 1970, Ferris sent a letter to John Badalich, Executive Director of the PCA, requesting an extension on his compliance date until July 30, 1971, which was granted. On July 6, 1971, Ferris requested another extension until September 30, 1972, because of the uncertainty in the highway plans. One day later, the assistant commissioner of transportation submitted a letter, on behalf of Fitger, to the PCA, also asking for the extension. The PCA granted the extension, but advised Ferris that there would be no further extensions beyond September 1972.

On July 17, 1972, Ferris attended a meeting with various transportation department officials and staff. At the meeting Ferris expressed his concern about the progress of the road planning study and the impending September 30 PCA deadline. Ferris testified that he was told that all the plans under consideration involved taking the Fitger property. He informed everyone present of Fitger's dilemma. He was told that the state could not commence the process of condemnation until they had approval of the project, and that any current appraisal would be scrapped because the property would have to be reappraised at the time of condemnation. Ferris testified there was no consensus at the meeting that it would be impractical to install the pollution control improvements.

The next day the Governor of Minnesota called Ferris. Ferris testified that the Governor realized Fitger was being "squeezed" by two state agencies. Ferris expressed his concern that the property would be forced to shut down and later be appraised as a defunct plant that was closed for economic reasons rather than because of the situation with the state. He asked the Governor for a letter from the transportation commissioner verifying that any later appraisal would be as an operating brewery. Ferris testified that the Governor agreed, directing Peter Gove to handle it, on the condition that Ferris not "make a political football out of the Fitger's Brewery being closed down." Ferris testified that he called the following week and met with the Governor and contacted Gove about the letter. Gove said they were working on it and Ferris would hear from them shortly. Ferris testified that he called several times to remind Gove.

On September 5, 1972, Ferris wrote a follow-up letter to the Governor, requesting that the state immediately appraise the Fitger property for condemnation purposes. It was evident to the state that Fitger was proceeding with a plan to close the brewery. Before receiving a response, Fitger held a stockholders' meeting. At the meeting, Ferris explained the situation and reported that the brewery had been promised a letter from the commissioner's office prior to September 30, which would state that all the proposed highway plans under consideration involved use of the brewery property and that installation of pollution devices was therefore impractical. Fitger's board unanimously adopted a resolution that the brewery close on September 30, subject to receipt of the commissioner's letter.

On September 26, 1972, Ray Lappegaard, Highway Commissioner, sent a letter to Ferris on the Governor's behalf. Lappegaard's letter stated in part:

As we all know, it appears that it would be impractical for you to install pollution abatement facilities in view of the planning currently in process regarding the possible extension of I–35 within the City of Duluth.

We can inform you that in all of the plans now under consideration for the extension of I–35, some part or all of the Fitger Brewing Company property would have to be acquired. I am sure you are aware that the federal regulations governing our operation do not permit us to make an acquisition or, indeed, begin the process until the final alignment of the highway is determined.

\*     \*     \*     \*     \*     \*

In addition, we must advise you that there is a possibility that I–35 may not be extended beyond Mesaba Avenue; the possibility of some other alignment of which we are unaware of at this time, other proposals from our consultants or other consultants, or the public, which

may eliminate the necessity of taking the Fitger Brewing Company property.

Respondent contends that the state misrepresented the applicable federal regulations on the need to delay condemnation. At trial, respondent introduced as evidence a March 14, 1973 letter to Ray Lappegaard from the U.S. Department of Transportation explaining the state's limitations on making acquisitions. The letter listed alternatives available to the state:

1) *Total Takes* can be made following FHWA approval of the Location Study Report providing: a) the location is positively fixed, * * *

2) *Partial Takes* can be made following FHWA approval of the Design Study Report providing the NEP [EIS] procedures have been satisfactorily completed.

3) *Hardship Cases* involving both total and partial takes can be authorized at any time, even though the NEP Act procedures have not been completed.

In 1969, the federal highway agency adopted new regulations requiring a two phase hearing process prior to the development of a federal-state interstate project. States were thereafter required to hold a corridor hearing, a design hearing, and receive federal approval of both the corridor and design of the proposed interstate facility prior to receiving federal funding for the project.

c. Fitger closing.

On September 30, 1972, four days after Commissioner Lappegaard sent his letter describing possible future events, the Fitger Brewery closed. The property was idle for the following years but had a number of expenses. The jury found that expenses incurred to maintain the property totaled $812,797.

d. The final highway alignment and subsequent events.

On March 20, 1972, the Eckbo team reported its preferred alternative alignment, which would have required taking the Fitger property. The department of transportation held the first corridor hearing on the proposal on October 19, 1973. The propos-

al met with extensive opposition and several alternatives were proposed at the hearing.

In 1975, the mayor of Duluth appointed a citizens committee to try to reach consensus on the project. The committee had two primary concerns: protection of public access to Lake Superior and preservation of various historic buildings. After extensive public hearings, on April 1, 1976, the committee recommended an alternative route which did not require the use of the Fitger property. This was eventually approved, and acquisition procedures began in February 1978. Fitger's railroad access was acquired by the state. Fitger appealed the commissioner's award of $65,000 on the grounds it was insufficient, and the state appealed it as excessive. That action is pending before the trial court.

In 1974, the state opposed Fitger's petition to the city to vacate a street easement on Fitger's property, because the state believed that the property would be used for I-35. In 1975, the state asked Fitger to oppose its property's inclusion on the National Register of Historic Places, because the state needed the property for the highway.

Fitger brought the current action in January 1978, in St. Louis County district court.

The Fitger property was sold to a private developer for $700,000 in 1983.

e. The trial.

The trial court submitted special interrogatories to the jury on the taking issue. Answering the interrogatories submitted, the jury found that (1) Fitger's business was adversely affected by the publicity about the highway plans; (2) Fitger reasonably relied on the state's representations that all of the proposed plans involved acquiring the property, and that it would therefore be impractical to install the pollution abatement equipment; and (3) the state "restricted" Fitger in improving or disposing of the business. Based on the jury's answers, the court found that a taking of Fitger Brewing Company occurred

by way of inverse condemnation on or about September 30, 1972.

The jury also found that the fair market value of the Fitger property on the date of closing was $1,250,000, and that $812,727 would compensate Fitger for expenses incurred between that date and the date of sale of the property. The court entered judgment for Fitger in the amount of $1,087,833, representing the damages established by the jury, less the income derived by Fitger ($974,964) after September 30, 1972.[1]

At the trial the state raised several arguments: (1) as a matter of law the state's planning, design, and precondemnation activities did not constitute a taking for which respondents were entitled to compensation; (2) respondent improperly brought an action for damages rather than seeking a writ of mandamus for condemnation proceedings; and (3) respondent's claim for damages from the state was barred by sovereign immunity. The state also objected that the trial court erred in barring opinion testimony of the going concern value of the Fitger property by the state's expert, and the trial court improperly submitted the taking issue, a question of law, to the jury. The same questions are raised on the state's appeal.

## ISSUE

Did the state's actions, followed by the respondent's decision to close its brewery, constitute a taking for purposes of the constitutional requirement of compensation?

## ANALYSIS

■ Whether a taking has occurred is a question of law the trial court must answer. *Alevizos v. Metropolitan Airports Commission*, 298 Minn. 471, 484, 216 N.W.2d 651, 660–61 (1974). This court on review need not defer to the trial court in reviewing questions of law, and therefore may review this issue de novo. *Alwes v.*

*Hartford Life & Accident Insurance Co.*, 372 N.W.2d 376, 378 (Minn.Ct.App.1985).

■ Generally a suit in inverse condemnation seeks to recover the value of property which has been taken in fact by the governmental defendant although no formal exercise of the power of eminent domain has been attempted by the government. *Alevizos*, 298 Minn. at 477, 216 N.W.2d at 657. *Alevizos* established the two-part test for a property owner seeking compensation for damage caused by governmental action. The owner must be able to show first,

a direct and substantial invasion of his property rights of such a magnitude he is deprived of the practical enjoyment of the property

and second,

that such invasion results in a definite and measurable diminution of the market value of the property.

*Id.* at 487, 216 N.W.2d at 662. Such a finding would constitute a "taking" in the constitutional sense.

■ In this case, the state did not physically take or use the Fitger Brewery property in the construction of interstate highway 35–E. Even without a physical taking, however, the state can be ordered to institute condemnation proceedings and compensate the owner, if the state's actions damage property in such a way as to constitute a taking. *Thomsen v. State*, 284 Minn. 468, 471, 170 N.W.2d 575, 578 (1969). The dispute here is whether the state's preparatory steps for a taking which was later abandoned, but which resulted in damage to the owner who abandoned investments needed to preserve the property, constitutes a taking.

■ The state contends that the well-established rule in the majority of states is that a *proposed* condemnation and taking does not rise to the level of a compensable taking, if the state does not actually take or use the property. Only two Minnesota

---

**1.** The trial judge decided to apply the "prudent investor" formula, not challenged in this appeal, to calculate interest on the award. After hearing the arguments of the parties, the court ordered judgment for Fitger of $5,422,241 for damages and interest calculated since September 30, 1972; and $191,236.98 for costs and attorney fees.

cases raise this theory. In *Spaeth v. City of Plymouth*, the supreme court stated in dicta that generally, "a landowner has no action against a government body for mere plotting or planning, without more, in anticipation of taking land." *Spaeth v. City of Plymouth*, 344 N.W.2d 815, 820 (Minn. 1984).

In *Orfield v. Housing & Redevelopment Authority of St. Paul*, 305 Minn. 336, 232 N.W.2d 923 (1975), an apartment building suffered physical deterioration and declined in value after the surrounding neighborhood was declared an urban renewal area. The owner brought suit to recover the loss in value, claiming it resulted from the blight caused by the neighborhood designation. The supreme court held that

> economic loss caused by the altered character of a neighborhood due to normal activities in connection with an urban renewal project, without more, does not constitute a de facto taking of the property in a constitutional sense.

*Orfield*, 305 Minn. at 341, 232 N.W.2d at 927 (1975).

In a New York appellate decision cited in *Spaeth*, a city redevelopment project was formed and began notifying property owners, including plaintiff, that their property would be taken by eminent domain. *City of Buffalo v. Clement Co.*, 28 N.Y.2d 241 at 255–58, 321 N.Y.S.2d 345 at 357–59, 269 N.E.2d at 903–05 (1971). After the city advised plaintiff several times, over a period of two to three years, that his premises would have to be vacated by a certain deadline, plaintiff gradually relocated his large printing company. One month before the final deadline he had moved out completely. Properties in the area suffered vandalism and declined in value. The New York court held there had been no de facto taking of Clement's property, despite the fact that the property had become unusable, and noted that the condemnation was only one of three reasons motivating the move. The court distinguished between a de facto taking, in which the condemnor physically takes the property or legally interferes with the owner's power of disposition of the property, and condemnation

blight, which it said affects only the impact of the government's acts upon the valuation of the condemned property in the subsequent de jure proceeding. *Id.*

Appellants argue that property is not taken when the owner's loss of the property results from its exercise of choice. They argue the state is required to compensate the owner only if the property is lost due to the events the state controls. The policy underlying this argument is that the power to use eminent domain is a legislative function, and allowing individual property owners to determine what property the state "takes" usurps this legislative power. *See Kelmar Co. v. District Court of Fourth Judicial District*, 269 Minn. 137, 141, 130 N.W.2d 228, 231 (1964).

Conversely, respondent argues there was a substantial and unreasonable invasion and taking of its property because of the following factors: (1) the state's longstanding plan to take the Fitger property; (2) the openness and publicity surrounding the plan; (3) the state's confirmation in 1972 that all of the proposed options would involve taking the property; and (4) the state's confirmation that it would be impractical to install the pollution abatement facilities. Fitger contends these actions were tantamount to an agreement with the owner of the Fitger property that the closing would be considered a consequence of a taking, not of the financial status of the brewery.

A number of cases from other jurisdictions suggest support for Fitger's argument. *See, e.g. Richmond Elks Hall Association v. Richmond Redevelopment Agency*, 561 F.2d 1327 (9th Cir.1977) (taking occurred where agency announced proposed condemnation, notified owner it would acquire property, and property value declined greatly); *Benenson v. United States*, 548 F.2d 939 (Ct.Cl.1977) (taking occurred where Congress passed plan for building public square on property and plan was publicized, owner could no longer sell property and was prevented from demolishing or using property for new building, and government assured owner property would be acquired and discussed trading property

with owner); *Washington Market Enterprises, Inc. v. City of Trenton*, 68 N.J. 107, 343 A.2d 408 (1975) (taking occurred when city abandoned redevelopment project after threat of condemnation had effect of blighting the area and made property unusable and unsaleable); *Klopping v. City of Whittier*, 8 Cal.3d 39, 104 Cal.Rptr. 1, 500 P.2d 1345 (1972) (taking of rental income occurred where precondemnation announcements, specifically aimed at plaintiff's property, prevented owner from using property profitably); *Drakes Bay Land Co. v. United States*, 424 F.2d 574, 191 Ct.Cl. 389 (1970) (taking occurred where landowner advised that seashore legislation to be enacted would require taking his land, owner was prevented from subdividing or developing land, and government warned potential buyers of land of likely condemnation and warned owner it might be fraudulent to sell it); *Foster v. City of Detroit*, 254 F.Supp. 655 (E.D.Mich.1966), *aff'd*, 405 F.2d 138 (6th Cir.1968) (taking occurred where city selected older area for slum clearance and public housing, commenced condemnation proceedings, and substantially contributed to aggravated deterioration and decline in property values in area by discouraging improvements, and by other conduct).

Here, the trial court resolved the taking question based on facts found by a jury.[2] These critical questions were submitted to the jury:

> Before September 30, 1972, was Fitger's business adversely affected as a result of public announcements and other publicity, generated by the State that the route for Interstate 35 would require the taking of Fitger's property?

> Did Fitger's reasonably rely on the State's representation that it would be impractical for Fitger's to install pollution abatement facilities because all of the State's I–35 plans would require the acquisition of some or all of Fitger's property?

> Did the State by its acts or conduct restrict Fitger Brewing Company in improving, developing, utilizing, or otherwise disposing of its property between the date of its public announcement in November 1970 and December 1983, when the property was sold?

The jury answered these and other interrogatories in the affirmative.

The trial court's interrogatories reflect its conclusion as a matter of law that there was a de facto taking if the state's publicized planning "adversely affected" Fitger's business, if Fitger "reasonably rel[ied]" on the state's concurrence that Fitger improvements were impractical, and if Fitger's choice on the improvement issue was "restrict[ed]" by the state's actions. We conclude this determination of the law on a de facto taking was in error.

In *Orfield*, discussed above, the supreme court found that designation of an urban renewal area, followed by an owner's choice not to make property improvements, did not constitute a taking. Significantly, however, the court recognized that "abuse of the power of eminent domain * * * directed against a particular parcel could constitute a de facto taking." *Orfield*, 305 Minn. at 342, 232 N.W.2d at 927. The court rejected the property owner's argument that a letter from the redevelopment authority was evidence of an abuse of the power of eminent domain. Rather, the letter "was nothing more than a good-faith response" to the owners' request that their property be taken, and "the letter promised nothing more than consideration of the request if funds became available." *Id.* In fact, the letter considered in *Orfield* strongly urged the owners to maintain their property so that it would not depreciate before an actual taking occurred. *Id.* at 338–39, 232 N.W.2d at 925.

■ Thus, under *Orfield*, the question is whether the state has abused its power of

---

**2.** As stated earlier, the trial court must, as a matter of law, determine whether a taking has occurred. *Alevizos*, 298 Minn. at 485, 216 N.W. 2d at 660. If the court concludes there has been a taking, damages must then be determined as a matter of fact. *Thomsen*, 284 Minn. at 475, 170 N.W.2d at 580. Where the court's conclusion on taking requires resolution of disputed underlying fact questions, the court may empower a jury to determine these facts. *Id.* at 475, 170 N.W.2d at 580–81.

eminent domain. We know from *Orfield* that there is no such abuse if the state makes it clear to the owners there may be no taking, does not abuse its discretion by abandoning a plan to take, and urges the owners to make necessary property improvements.

In September 1972, Ferris asked for the state's confirmation that all proposed plans for the highway called for taking the Fitger property, and that it would be impractical to improve the property. He wanted assurances the Fitger property would be taken as a brewery, and that the brewery closing would not be treated as a consequence of general economic facts. The state responded with a last-minute letter that gave Ferris the assurances he wanted regarding the impracticality of improvements but left open the possibility that other plans could be formed in the future that would not require acquiring the Fitger property. Thus, the state made it clear in September 1970 that it might not take the Fitger property, and there is no evidence of bad faith in its decision not to take. Fitger president Ferris evidently wanted assurances Fitger would be compensated for loss of a brewery operation, and he got no such assurance. Rather, the state made it evident the taking might not occur.

In *Orfield*, the public authority urged the owners to maintain their property. Here, the state said it appeared to be correct to consider that pollution control improvements would be impractical in view of planning for a possible highway project. We conclude this response of the state does not rise to the level of an abuse of power constituting a de facto taking.

Fitger's freedom of choice was not destroyed by the actions of the state. Fitger wanted assurances tantamount to an immediate condemnation, and it clearly did not get those assurances. While Fitger may have reasonably relied on the state's comments on the impracticality of improvements, its choice of action was not controlled or restrained by the state. *Cf. Foster*, 254 F.Supp. at 660–61 (where property improvements were necessary to avoid rapid deterioration, and city instructed owner it was not to improve property in anticipation of increased compensation, and court found the city encouraged decay and desertion of area). In *Foster*, and other cases cited by appellant, the public authority deliberately and unequivocally induced a decision to let property deteriorate. Here, the wishes of the state were unclear, and the state carefully noted the possibility that no taking would occur. On September 26, 1972, the Commissioner of Transportation noted that Fitger must be advised that "there is a possibility" highway construction would not occur past the Fitger property, and "the possibility of some other alignment of which we are unaware at this time" which would eliminate the need to take the Fitger property. Four days later, despite this warning, Fitger closed its plant.

The jury found that actions of the state restricted Fitger's improvement plans. The record supports this finding, but does not show restrictions by the state constituting control or restraint of Fitger's use of the property, or even the unequivocal inducement by the state of a decision against improvement of the property.

We find no authority permitting us to expand the concept of de facto taking, suggested in *Orfield*, to a case where the landowner's freedom of choice on improvements is not substantially destroyed by state action. Absent such control over the owner's use of its property, we are dealing with normal "incidents of ownership." *Orfield*, 305 Minn. at 341, 232 N.W.2d at 927. *See Spaeth*, 344 N.W.2d at 821 (planning without taking an exercise of state police power); *Foster*, 254 F.Supp. at 662 (actions without taking a common burden of citizenship).

## DECISION

The trial court erred in finding that the state's actions constituted a taking of the Fitger property, where the state did not physically or legally prevent the owner's use of the property or force its closing.

Reversed.