The 614 COMPANY, Appellant,

v.

The MINNEAPOLIS COMMUNITY DE-
VELOPMENT AGENCY and The City
of Minneapolis, Respondents.

No. C0–95–2027.

Court of Appeals of Minnesota.

May 7, 1996.

Roger J. Magnuson, Michael J. Wahoske, Margaret M. Zverinova, Dorsey & Whitney, P.L.L.P., Minneapolis, for appellant.

James R. Dorsey, Marc D. Simpson, Steven P. Zabel, Gregory R. Fitzharris, Leonard, Street and Deinard, Minneapolis, for respondent Minneapolis Community Development Agency.

Michael T. Norton, James A. Moore, Office of the City Attorney, Minneapolis, for respondent City of Minneapolis.

Considered and decided by CRIPPEN, P.J., and WILLIS and MULALLY*, JJ.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

CRIPPEN, Judge.

The 614 Company contends that its pleadings successfully state causes of action for (a) a temporary taking of its property by respondents, the City of Minneapolis and the Minneapolis Community Development Agency (MCDA), requiring compensation under both federal and state constitutions, (b) alternative relief premised on constitutional guarantees of both procedural and substantive due process and of equal protection, (c) common law recovery for the third-party beneficiary of the contract, and (d) tort relief due to negligence or tortious interference with prospective business advantage. Concluding that the complaint of appellant 614 failed to state a claim upon which relief could be granted, the trial court dismissed the suit. We reverse and remand on the takings claim but otherwise affirm the trial court's decision.

## FACTS

The facts of the case are drawn from the pleadings and other items of record as well as from a companion case involving different landowners.[1]

In November 1983, the MCDA adopted a redevelopment plan for certain properties located in the South Nicollet Mall area of downtown Minneapolis. In August 1985, the city council directed the proper city officers and staff to negotiate exclusively with La Societe Generale Immobiliere (LSGI) to develop a new shopping center in this area. The shopping center was to cover three and one-half blocks of property owned by appellant and several other landowners.[2] LSGI's plans centered on a "dome and tunnel" design that routed traffic through a tunnel under the shopping center. The "dome and tunnel" design was highly controversial.

The city sold approximately 75 million dollars in general obligation bonds to finance, in part, the possible acquisition of land and buildings within the development district and to encourage proposed retail projects. Between August 1985 and February 1986, the city publicized the possible acquisition of a number of South Nicollet Mall properties to accommodate the redevelopment.

On November 3, 1986, the city and LSGI executed a "Contract for Private Development of Land." The contract provided:

It is understood by the Developer and the MCDA that no action of the Minneapolis City Council shall be necessary to approve the form or content of any of the proposed Project Plans or Specifications except for final design approval of the Project's treatment of the Nicollet Mall by the City Council * * *.

The postclosing schedule required LSGI to obtain the commitments of two major anchor tenants.

Shortly after November 3, 1986, the MCDA notified appellant that the city was going forward with the LSGI project and that the city would be appraising appellant's properties for condemnation. The city sent to the affected properties appraisers who advised tenants that they were conducting appraisals in connection with pending condemnation procedures.

Meanwhile, LSGI showed the "dome and tunnel" design to numerous department stores. Nordstrom's Incorporated agreed to be an anchor tenant. The Neiman–Marcus Group indicated a possible interest in being an anchor tenant. At the same time LSGI was showing the "dome and tunnel" design to department stores, the MCDA board adopted the "Cramer Resolution," which directed the agency, city officials, and LSGI to abandon the "dome and tunnel" design and to develop a new design compatible with the open-air nature of the Nicollet Mall. By November 3, 1987, LSGI was still unable to obtain a second anchor tenant. On November 5, 1987, City of Minneapolis Mayor Fraser wrote to Nordstrom's Incorporated and The Neiman–Marcus Group indicating that the "dome and

---

1. *Siegel, et al. v. City of Minneapolis,* Hennepin County File No. 94–017966, 1996 WL 229242 (Minn.App. May 7, 1996).

2. The claims raised by the other landowners are addressed in a separate, unpublished opinion of this court. *Siegel, et al. v. City of Minneapolis,* No. C0–95–1637, 1996 WL 229242 (Minn.App. May 7, 1996).

tunnel" design had been abandoned. Nevertheless, the MCDA and the city continued negotiations with LSGI, giving it more time to fulfill its obligations under the original contract.

On January 20, 1988, the executive director of the MCDA issued LSGI a notice of default because LSGI was unsuccessful in its attempts to secure a sufficient number of anchor tenants. This notice started a contract period for redeeming from the default and avoiding termination.

LSGI presented new design plans on March 7, 1988, which the city council approved on April 1, 1988. The city also gave LSGI an extension until May 8, 1988, to find a second anchor tenant. On May 11, 1988, after LSGI again failed to produce a commitment from a second anchor tenant, the executive director of the MCDA informed LSGI that the period to cure the default had expired, but that it would forego termination of the contract if LSGI was willing to negotiate an amended development contract. An amended contract was never executed, and the MCDA finally terminated the development contract with LSGI on May 12, 1989.

Appellant owned property, including the Young Quinlan Building, situated at the south end of the Nicollet Mall. Prior to negotiations between the MCDA and LSGI, appellant planned to improve the retail and office space in the Young Quinlan Building, investing heavily in the building's renovation. Appellant contends it was close to reaching an agreement for the construction of an office tower on property adjacent to the Young Quinlan building. While the MCDA was developing plans with LSGI, however, the existing tenants' volume of business diminished, and appellant had difficulty marketing its building to potential tenants. The building became largely unoccupied, and the office tower developer built on other property, outside the planned development area.

Appellant asserts it asked repeatedly that its property be removed from the development plan area and formally requested removal in November 1987. When its request was refused, appellant initiated an action to accomplish the removal. In July 1988, the MCDA resolved to negotiate for removal of appellant's property from the development plan.

LSGI filed suit in federal court against the MCDA and the city, alleging breach of contract and due process violations. *La Societe Generale Immobiliere v. Minneapolis Community Dev. Agency*, 827 F.Supp. 1431 (D.Minn.1993). A jury found in favor of LSGI, and the public bodies appealed. The Eighth Circuit Court of Appeals reversed, holding that there was no breach of contract and that the MCDA and the city were entitled to judgment as a matter of law on the breach of contract and civil rights claims. *La Societe Generale Immobiliere v. Minneapolis Community Dev. Agency*, 44 F.3d 629, 637, 641 (8th Cir.1994).

In November 1987, appellant sued the MCDA and the city. A similar suit was initiated at that time by other landowners in the development area. Respondents succeeded in their motion for dismissal of appellant's complaint under Minn. R. Civ. P. 12.02(e) for failure to state a claim upon which relief can be granted. Appellant initiated this appeal of the dismissal. Respondents contend the dismissal is defensible on alternative grounds (a) that appellant's complaint was improperly served and (b) that the claims are barred under the governing statute of limitations.

## ISSUES

1. Has appellant, who alleges that actions of respondents in the nature of a de facto taking temporarily destroyed all economically viable use of appellant's property, but who does not claim that its property interest became worthless, successfully stated a cause of action for a taking of its property for which it is entitled to be compensated?

2. Also with respect to the claim of compensable taking, does appellant's complaint adequately allege a course of precondemnation conduct by respondents that is sufficient to state a de facto taking claim?

3. Has appellant adequately stated any additional causes of action?

## ANALYSIS

### I. Taking

At the core of appellant's contentions is the assertion that respondents, through their precondemnation activities, have taken, or destroyed or damaged, the value of appellant's property and, therefore, must compensate appellant for its loss under the Takings Clause of the Fifth Amendment of the United States Constitution and the Bill of Rights of the Constitution of the State of Minnesota. U.S. Const. amend. V (guaranteeing that no "private property be taken for public use without just compensation"); Minn. Const. art. I, § 13 (providing that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation"). The trial court dismissed the takings claim, concluding that the complaint failed to "state a claim upon which relief can be granted." Minn. R. Civ. P. 12.02(e) (1995).[3]

▮▮▮ The standard of review in cases dismissed for failure to state a claim on which relief can be granted is "whether the complaint sets forth a legally sufficient claim for relief." *Elzie v. Commissioner of Pub. Safety*, 298 N.W.2d 29, 32 (Minn.1980) (quoting *Royal Realty Co. v. Levin*, 244 Minn. 288, 290, 69 N.W.2d 667, 670 (1955)). Pleadings are adequate unless it appears "to a certainty" that there are no facts, consistent with the pleadings, sufficient to establish a right for relief. *Northern States Power Co. v. Franklin*, 265 Minn. 391, 395, 122 N.W.2d 26,

29 (1963) (upholding dismissal of "intrinsically inconsistent" pleadings). Moreover, if the complaint

> alleges constitutional violations, a rule 12 motion is subject to increased scrutiny to protect the public from "possible government overreaching." Thus, when the plaintiff alleges a constitutional error, a rule 12 dismissal is proper only when the defendant "demonstrate[s] the *complete* frivolity of the complaint."

*Schocker v. State, Dep't of Human Rights*, 477 N.W.2d 767, 769 (Minn.App.1991) (alteration and emphasis in original) (citation omitted) (quoting *Elzie*, 298 N.W.2d at 32, 33), *review denied* (Minn. Jan. 30, 1992).

Appellant's takings claim requires a two-part analysis. First, we must determine whether appellant alleged a loss of property interests sufficient to demonstrate a taking for which compensation is due. Second, we must explore the character of the public action to determine if it targeted certain property and required its public use, thus constituting a de facto taking.

### A. Property interests allegedly taken.

▮▮▮ Since the decision of the United States Supreme Court in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), takings law under the federal constitution, while significantly reshaped, has been left in a state that remains unclear.[4] *Lucas* established a

---

**3.** Although the trial court granted a rule 12 dismissal, it treated the prevailing motion as one for summary judgment "to [the] extent" that the court gave attention to (a) the opinion in *La Societe Generale Immobiliere v. Minneapolis Community Dev. Agency*, 44 F.3d 629 (8th Cir. 1994), and (b) appellant's assertion to the federal trial court that it could not establish a state court claim of inverse condemnation because respondents had not legally prevented appellant from using its property. Neither of these considerations significantly alters the rule 12 standard of law on dismissal of the case.

**4.** *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) reflects the former, more limited application of takings law. In *Penn Central*, the Supreme Court acknowledged that a taking is "more readily" found in the government's physical invasion of property, *id.* at 124, 98 S.Ct. at 2659, and highlighted several cases in which

there was no taking despite the government's interference with the "most beneficial use" of property. *Id.* at 127, 98 S.Ct. at 2660. *Penn Central* acknowledges that a partial use restriction on property may constitute a taking, but only where the restriction is "not reasonably necessary to the effectuation of a substantial public purpose." *Id.* We find no merit in appellant's contention, posed in the event it is not entitled to relief under *Lucas*, that it may have greater rights under *Penn Central*. Also, although appellant's *Lucas* claim may be strengthened by evidence regarding the time spent by public authorities in entertaining its condemnation plan, we conclude that its taking claim cannot rest singularly on the time factor. *See Agins v. City of Tiburon*, 447 U.S. 255, 263 n. 9, 100 S.Ct. 2138, 2143 n. 9, 65 L.Ed.2d 106 (1980) (confining to cases of "extraordinary delay" the right to compensation for loss of property value during the process of governmental decisionmaking).

new breadth of judicial action in defense of Fifth Amendment rights and mandated compensation for an imprecisely defined variety of partial takings. *Id.* at 1015, 112 S.Ct. at 2893. Compensation for a taking is now required solely upon a showing that the public regulatory action deprives the landowner of "all economically beneficial or productive use" of its land. *Id.* Variously, the Supreme Court substituted "economically viable," "economically feasible," "economically valuable," or simply "productive" or "developmental" in its description of the uses that could no longer be taken without compensation. *Id.* at 1016–18, 1020–22, 1024–25, 112 S.Ct. at 2894, 2896, 2898–2900. Moreover, the court interchanged "use" with "uses" and use "options". *Id.* at 1016–19, 112 S.Ct. at 2894–95.

In *Lucas*, the court dealt with two South Carolina beachfront lots that could not be improved as planned with single-family homes because of a land-management statute adopted by the state legislature. *Id.* at 1006–08, 112 S.Ct. at 2889. Because the owner retained his property for whatever alternative purposes it might be used, the Supreme Court saw itself bound to determine if the "dramatic effect [of the legislative act] on the economic value of Lucas's lots accomplished a taking." *Id.*

■ *Lucas* calls for compensation based on loss of economic value. It views property in terms of uses or options for use and requires that the uses, seemingly each of them if more than one be examined for lack of economic benefit. Although not including "unprofitable" in its litany of words tied to the concept of economic use of property, the court (a) uses the synonym "beneficial," (b) speaks of developmental and productive uses, and (c) deals with a trial court finding that evidently equated "valueless" with the loss of the most profitable use. *Id.* at 1006–08, 112 S.Ct. at 2889; *id.* at 1043–45, 112 S.Ct. at 2908 (Blackmun, J., dissenting). An academic commentator, calling for an even bolder rule of compensation for partial takings, suggests that the *Lucas* opinion substitutes "Just Compensation Clause" for "Takings Clause" as a reference to the governing con-

stitutional provision. Richard A. Epstein, *Lucas v. South Carolina Coastal Council: A Tangled Web of Expectations,* 45 Stan. L.Rev. 1369, 1391 (1993).

Pertinent to appellant's taking claim, it is also significant that in *Lucas,* the amendments to the state land-use law which prohibited construction of a home on Lucas's property may also have reduced potential damage to Lucas's land. *Lucas,* 505 U.S. at 1009–10, 112 S.Ct. at 2890. Addressing that change of law, the Supreme Court observed as a settled matter of law that "temporary deprivations" are compensable under the Takings Clause. *Id.* at 1011–12, 112 S.Ct. at 2891.

■ In this case, appellant alleged "in sum" that the MCDA and the city temporarily denied it "all economically viable use" of its property. In an earlier pleading, appellant stated that it suffered a reduced occupancy of the Young Quinlan Building so that it was "precluded" from using its property "in an economically viable fashion." These pleadings would permit the proof of facts that would establish appellant's right to recovery under *Lucas.* The trial court concluded, however, there were no facts available to demonstrate a taking this complete, explaining that the summary pleading was not supported by specific allegations in appellant's complaint, which the court viewed as allegations of only "partial impairments." In sum, the court observed, "[appellant] hardly left [its] property economically idle" because appellant continued to improve its property and seek new tenants.

We cannot disregard or minimize the holding of *Lucas,* as would be required to approve the trial court's rationale. The trial court premised its dismissal of the case on the conclusion that appellant's more specific pleadings were inconsistent with the notion of a total taking. We conclude that the trial court erroneously deprived appellant of the opportunity to offer evidence supporting its allegations of a taking.

No doubt there is room for concluding that *Lucas* calls for compensation only in the event of a "total" taking.[5] But *Lucas*'s hold-

5. In one instance, the *Lucas* majority speaks of its holding as one for a "total taking" inquiry.

ing employs a standard not confined to loss of all economic value, and the case was decided on facts where no such showing was made. *Lucas* calls for identifying the prospective uses of property and finding if any of them shows economic viability. If *Lucas* is read to reduce this issue to a determination of whether there has been a "total" loss of value, it must be observed that the Supreme Court has created an imprecise standard that invites many competing opinions in distinguishing between partial and total takings where a property owner has suffered the loss of economic value without physical invasion of its property.[6] In this light, we have examined the pleadings characterized by the trial court as claims of "partial" impairment of appellant's use of its property.

Appellant does not suggest that its property became totally unproductive as a result of actions by the city and the MCDA. But its allegations identify only two prospective uses of a partially-improved parcel of land in the business center of a large city (leasing activity in an existing building and development of adjoining land), and appellant alleges repeatedly that neither of these uses was economically feasible after the mall-development project was initiated.

Overall, in addition to its previously stated "in sum" allegation, appellant stated that it was deprived of all "significant" ownership interests. On the one hand, this allegation is consistent with the conclusion that appellant's interests were minimal, but retained some value. On the other hand, this allegation is consistent with proof that none of appellant's remaining interests was economically viable, beneficial, productive, feasible, or valuable. Similarly, appellant alleges that the condemnation plan (a) "radically curtailed" its ability to produce income from the property, (b) rendered the property "essen-

tially" useless and unprofitable, (c) "had a grave economic impact" on the value of its property, (d) "interfered with [its] reasonable, investment-backed expectations as the uses to which the property could be put," and (e) caused "substantial devaluation" of its property and loss of "highly lucrative" development opportunities. None of these allegations suggests a complete loss of value, but all are sufficient to permit proof that none of appellant's choices for use of its land were left economically viable.

The trial court found appellant's pleadings deficient in their description of specific losses in rental and development activity. Appellant alleged that the city's and the MCDA's actions caused it "substantial losses" in revenue from rentals of the Young Quinlan Building, "significant and measurable harm" to its ability to develop its property and "similar losses" in the financial markets. In its rental activity, appellant alleged that it suffered "reduced" occupancy, that its rental rates "declined sharply" and were "substantially reduced," that it was unable to finalize new leases in a "significant majority of cases," and that its expenses "far surpassed" its available rental income. As to the financial markets, evidently pertinent to both appellant's rental and development prospects, the complaint alleged that appellant's ability to obtain financing was "severely inhibited" because credit was available only through a "limited number" of sources and on "less favorable" terms.

These allegations, although repeatedly limited so as to avoid the suggestion of worthlessness, permit proof that the city's and the MCDA's actions left appellant without economically viable rental and development uses. The record does not permit inferences or even speculation of alternative uses of any

*Lucas,* 505 U.S. at 1030–31, 112 S.Ct. at 2901. A concurring justice discusses the concept as one on the loss of "all value" of property. *Id.* at 1033–35, 112 S.Ct. at 2903 (Kennedy, J., concurring). One of two dissents speaks of a "total taking" rule. *Id.* at 1064–67, 112 S.Ct. at 2919–20 (Stevens, J., dissenting).

**6.** Because the *Lucas* trial court had found the beachfront lots were rendered useless, although the facts of the case indicated that the owner had

not suffered a total loss of value, Justice Souter issued a statement with the opinion to express his conviction that the case did not permit the review of the facts that would permit the court to determine a usable standard on regulatory takings. Souter argued that the court should not have accepted the case for review and concluded that the court's holding did not contribute to the formulation of a more certain standard. *Lucas,* 505 U.S. at 1075–77, 112 S.Ct. at 2925 (Souter, J., statement).

significance. Appellant has adequately stated a cause of action for a taking requiring compensation under the federal and state constitutions.

## B. De facto taking

*Lucas* is part of a body of takings law that dwells on the effects of public action suffered by a landowner. But the precondemnation activity of respondents involves a second takings issue, a cause and effect question as to whether the public action required the losses actually experienced. In *Lucas,* the public controls were in the form of unavoidable land use regulation, and we must consider whether the public action in this case may also involve an act of taking. To decide this question, we must determine whether the appellant's allegations state a claim that city and MCDA precondemnation activities involved sufficient control of appellant's use of its property to constitute an act of taking. *See Orfield v. Housing & Redev. Auth.,* 305 Minn. 336, 342, 232 N.W.2d 923, 927 (1975) (finding no taking connected with economic losses in a neighborhood that were caused by urban renewal planning, but recognizing that a "de facto" taking occurs when eminent domain powers are abused and are directed against a particular parcel); *Fitger Brewing Co. v. State,* 416 N.W.2d 200, 208 (Minn.App.1987) (reviewing cases on de facto taking; finding no taking where condemnation plans are directed at a parcel, but public authority (a) makes it clear taking may not occur, (b) urges continued improvement of affected parcel, and (c) does not abuse its discretion in abandoning the taking plan) *review denied* (Minn. Feb. 23, 1988).

In *Fitger* we noted that the landowner's "freedom of choice was not destroyed by the actions of the state." *Id.* We observed that the public body had "restricted" the owner's improvement plans, as the trial court jury had found, but that the record did not show the owner's uses of the property were controlled by the public action. *Id.* We found less abuse of eminent domain powers because the public body carefully revealed the possibility that condemnation might not occur. *Id.*

The precondemnation cases raise a number of questions pertinent to the actions of respondents that affected the property of appellant. A development commitment existed for over two years. Appellant's property was included in tracts that were "to be acquired or may be acquired." The trial court concluded that use of the tentative "may" puts this case within the orbit of *Fitger* as a matter of law. But *Fitger* was decided on a trial record and on the showing (a) that the condemnation authority carefully stated that its taking might not occur, and (b) that the owner should continue with its development plans, even though this might increase the state's ultimate condemnation cost. *Fitger,* 416 N.W.2d at 208. And the facts in this case involve commitments to proceed evidenced by the completion of major financing and the contractual services of a developer.

The *Fitger* court's primary rationale, highlighting the tentative nature of state activity, may indeed govern this case, but we cannot be certain based only on the pleadings. To permit a correct characterization of respondents' commitment to a taking in this case, there is a need for a more thorough development of the facts.

The *Fitger* court also examined the breadth of control imposed in precondemnation activity, finding in that case that the public authority actually encouraged the property owner to make improvements for its continued use of the parcel. *Id.* Appellant contends that the public development plan of respondents was targeted at its property and adjoining business parcels and that commitment to the plan left it with no means to protect its property from damage. The trial court dismissed the takings claim because appellant acknowledged it could not prove that the city imposed regulations that expressly curtailed appellant's freedoms to make investments in the property. Still, appellant alleges that its uses were "radically curtailed" by respondents' actions; and that the precondemnation development activity "inhibited" and even "precluded" appellant's economically viable use of its property. Although appellant's takings claim may not be

provable, its pleadings are not flawed as a matter of law.

Finally, the precondemnation takings law summarized in *Fitger* calls for a determination of whether the public authority has abused its discretion in abandoning its condemnation plan. *Id.* at 207–08. Because of the holding of the Eighth Circuit Court of Appeals, we know that respondents' abandonment of the project did not constitute a breach of contract with LSGI. *La Societe Generale*, 44 F.3d at 637. But appellant alleges wrongful or abusive conduct of respondents in (a) interfering with the marketing of the project to prospective anchor tenants, (b) revising elements of the design, and (c) declaring the developer to be in default of its contract. Appellant claims that these public agency actions were "unwarranted" and done "arbitrarily" and even "capriciously." If it fails to show an arbitrary abandonment of the LSGI plan, appellant emphasizes on appeal its claim that respondents inexcusably failed to remove appellant's parcel from its condemnation plan in November 1987, when the city announced that it had abandoned the LSGI design. Here again, having in mind the precondemnation case standards, appellant's pleadings are sufficient to withstand rule 12 scrutiny.

As we have noted before, this case is decided with ample doubts about appellant's ability to prove its cause of action. But its pleadings are adequate. We also anticipate the heavy public policy implications in takings law that threaten commercial and industrial development activity. Nevertheless, the pleadings demonstrate the need to anticipate a unique peril in development planning that severely threatens the usability of highly-valued or developed land in the commercial center of a large urban community.

## II. Other claims

Alternatively, appellant contends the respondents (a) violated its due process and equal protection rights, (b) violated its third-party beneficiary of contract rights, and (c) tortiously interfered with its prospective contracts. We affirm the trial court's dismissal of these claims for failure to state a claim upon which relief could be granted.

## A. Constitutional claims

First, government action violates an individual's substantive due process and equal protection rights if it has no rational relationship to a legitimate government interest. *Kottschade v. City of Rochester*, 537 N.W.2d 301, 309 (Minn.App.1995), *review denied* (Minn. Nov. 15, 1995); *Boyum v. Main Entree, Inc.*, 535 N.W.2d 389, 391 (Minn.App. 1995) (citing *Pacific Indem. Co. v. Thompson–Yaeger, Inc.*, 260 N.W.2d 548, 555 (Minn. 1977)), *review denied* (Minn. Sept. 28, 1995). Appellant argues that respondents' precondemnation activities interfering with its property interests constituted "truly irrational" pursuit of public policy.

Respondents acted within their contractual rights when they required LSGI to revise the "dome and tunnel" design, informed prospective anchor tenants of the change in design plans, and declared LSGI to be in default after LSGI was unable to meet the conditions of the postclosing schedule. *La Societe Generale*, 44 F.3d at 637 (absolving public authorities on LSGI breach of contract claim). Also, respondents continued negotiations and granted LSGI more time to commit anchor tenants. In short, respondents' actions were not, as appellant suggests, "truly irrational," but rationally related to the government's interest in the redevelopment of the South Nicollet Mall and in avoiding what it finally judged to be a poor development plan.

Second, a person is entitled to a fair process when the government is about to deprive or has deprived the person of liberty or property. *M.T. Properties, Inc. v. Alexander*, 433 N.W.2d 886, 891 (Minn.App.1988), *review denied* (Minn. Feb. 22, 1989); *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). A constitutionally protected property interest "has been defined as a 'legitimate claim of entitlement' and has been distinguished from a mere 'expectation.' " *Martin v. Itasca County*, 448 N.W.2d 368, 370 (Minn.1989) (quoting *Roth*, 408 U.S. at 576–78, 92 S.Ct. at 2708–10).

In this case, appellant argues that respondents deprived it of its property interest in the fulfillment of the development contract. We conclude that, at the very most, appellant had only an expectation that it would have a property interest in the fulfillment of the contract. Because expectations are not constitutionally protected, appellant's procedural due process claim was also properly dismissed.

### B. Contract claim

The trial court dismissed appellant's third-party beneficiary claim because there was no breach of contract and because appellant was not an intended beneficiary under the contract.

Assuming appellant is a third-party beneficiary, its claim for damages fails because it is collaterally estopped from arguing breach of contract.[7] The doctrine of collateral estoppel applies when

(1) the issue was identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Ellis v. Minneapolis Comm'n on Civil Rights*, 319 N.W.2d 702, 704 (Minn.1982) (quoting *Victory Highway Village, Inc. v. Weaver*, 480 F.Supp. 71, 74 (D.Minn.1979)).

The Eighth Circuit Court of Appeals determined the development agency did not breach the development contract. *La Societe Generale*, 44 F.3d at 637. Therefore, because (1) this action and LSGI's federal action involve the same breach of contract issue, (2) there was a final judgment, (3) the appellant was (arguendo) in privity with LSGI as a third-party beneficiary to its contract, and (4) LSGI was given full and fair opportunity to be heard on the breach of contract issue, appellant cannot now argue

that the development agency breached the development contract.

Alternatively, even if appellant is not estopped from arguing breach of contract, its claim for damages fails because it is not an intended beneficiary of the contract. Appellant may sue on the contract if it was intentionally made for its direct benefit. *Buchman Plumbing Co. v. Regents of Univ. of Minn.*, 298 Minn. 328, 333, 215 N.W.2d 479, 483 (1974). Generally, when there is no reference to the third party in the contract, there is no intent to benefit the third party. *See Chard Realty v. City of Shakopee*, 392 N.W.2d 716, 720–21 (Minn.App.1986) (no reference to plaintiff in contract) (citing *Cretex Cos. v. Construction Leaders, Inc.*, 342 N.W.2d 135, 139–40 (Minn.1984)), *review denied* (Minn. Nov. 19, 1986). But the absence of the third party's name does not preclude a finding of intent to benefit a third party "if the circumstances show otherwise." *Julian Johnson Constr. Corp. v. Parranto*, 352 N.W.2d 808, 811 (Minn.App.1984).

Although the contract does not name appellant as a beneficiary, appellant argues it is nonetheless an intended beneficiary because the MCDA was obligated to make efforts to obtain appellant's property and compensate it if necessary. Although appellant would have been compensated for its property (and thereby derive a benefit), compensation does not automatically indicate an intent to benefit. *See Cretex*, 342 N.W.2d at 139 (stating that while the third party may "receive a benefit when paid * * *, the issue is whether that benefit was intended by the contracting parties"). The record supports dismissal of the contract claim.

### C. Tort claim

The trial court dismissed appellant's claim for tortious interference with business contracts and negligence because respondents' actions were justified and because respondents are immune from tort liability on these facts.

---

7. Respondents do not argue collateral estoppel but instead law of the case. "Law of the case is a rule of practice followed between the Minnesota appellate courts and the lower courts." 3 Douglas D. McFarland & William J. Keppel,

*Minnesota Practice* § 2532 (1990). Because this is a case where the issue was first decided by a federal trial court, law of the case is an incorrect theory for barring the breach of contract claim.

 The standard for whether conduct is justified is whether it was just and reasonable under the circumstances. *Guerdon Indus. v. Rose,* 399 N.W.2d 186, 188 (Minn.App.1987). Minn.Stat. § 469.124 (1994) authorizes cities to activate redevelopment programs for improving the economy. The statute also states that

> the actions required to assist the implementation of these development programs are a public purpose and that the execution and financing of these programs are a public purpose.

*Id.* Because the statute provides that the actions themselves are a public purpose, respondents' precondemnation actions were justified.

Justification and immunity are independent affirmative defenses to municipal tort liability. *See Chabot v. City of Sauk Rapids,* 422 N.W.2d 708, 711 (Minn.1988) (applying only the immunity test); *Guerdon Indus.,* 399 N.W.2d at 188 (applying only the justification test). Because we have concluded that respondents' conduct was justified, we need not address immunity.

### III. Alternative objections to takings claim

Respondents also moved for dismissal of appellant's complaint under Minn. R. Civ. P. 12.02(d) for insufficiency of service of process and under Minn. R. Civ. P. 12.02(f) for failure to join a party. Having reviewed these alleged procedural irregularities, we find that they are not dispositive. Thus we have based our decision on the substantive merits of the case.

### DECISION

We reverse and remand for further proceedings, including discovery and subsequent disposition by motion or trial as is determined appropriate.

**Affirmed in part and reversed and remanded in part.**